# Lem Davis Tuggle, Jr.

## v.

# Commonwealth of Virginia

Record No. 840486

September 6, 1985

Present: All the Justices

*Jeffrey M. Gleason (Martin & Martin,* on brief), for appellant.
*Todd E. LePage, Assistant Attorney General (Gerald L. Baliles, Attorney General,* on briefs), for appellee.

STEPHENSON, J., delivered the opinion of the Court.

This case is before us again, having been remanded from the Supreme Court of the United States. In the guilt phase of a bifurcated jury trial, Lem Davis Tuggle, Jr., was convicted of capital murder for the willful, deliberate, and premeditated murder of Jessie Geneva Havens during the commission of, or subsequent to,

rape. Code § 18.2-31(e). In the penalty phase, the jury returned a verdict fixing Tuggle's punishment at death. By so doing, the jury found that the Commonwealth had proved both the "dangerousness" and "vileness" predicates beyond a reasonable doubt. The trial court confirmed the jury's verdict and sentenced Tuggle to death. We affirmed his conviction and sentence. *Tuggle* v. *Commonwealth,* 228 Va. 493, 323 S.E.2d 539 (1984).

Tuggle petitioned the Supreme Court of the United States for a writ of certiorari, and on May 13, 1985, in a summary disposition, the Supreme Court granted certiorari, vacated the judgment, and remanded the case to us "for further consideration in light of *Ake* v. *Oklahoma,* 470 U.S. 68 (1985)." *Tuggle* v. *Virginia,* 471 U.S. 1096 (1985). Thereafter, we directed counsel to brief and argue the question of *Ake*'s impact on Tuggle's conviction and sentence.

When we decided *Tuggle,* a state was not required to furnish a criminal defendant an independent psychiatrist. The Constitution required only that an accused's sanity be evaluated by a neutral examiner. *United States* v. *Baldi,* 344 U.S. 561 (1953). In *Ake,* however, the Supreme Court recognized for the first time that, in certain circumstances, a state is constitutionally required to provide an indigent defendant with the assistance of a psychiatrist.

More specifically, the Court held that "when a defendant has made a preliminary showing that his sanity at the time of the offense is likely to be a significant factor at trial, the Constitution requires that a State provide access to a psychiatrist's assistance on this issue, if the defendant cannot otherwise afford one." 470 U.S. at 74. Additionally, the Court held that when "future dangerousness [is] a significant factor at the sentencing phase" of a capital murder case, due process requires that an indigent defendant be entitled to psychiatric assistance on that issue. 470 U.S. at 86. Thus, our task is to determine the effect of the *Ake* holdings upon Tuggle's conviction and sentence.

I

The facts relevant to the present inquiry are undisputed. Initially, Tuggle filed a motion in the Smyth County General District Court requesting two mental evaluations. One evaluation, pursuant to Code § 19.2-169.1, would determine Tuggle's "capacity to understand the proceedings against him or to assist his attorney in his own defense." The other evaluation, pursuant to Code § 19.2-169.5, would determine whether Tuggle was sane at the time of

the offense. The motion alleged that Tuggle had been in the Commonwealth's penal system for a number of years, that he was the subject of a number of psychological evaluations and tests during his confinement, and that, in approximately 1971, he was evaluated at Southwestern State Hospital for mental defects or disorders and had not been informed of the results. The general district court judge denied the motion, finding no probable cause to believe that Tuggle was incompetent to stand trial or insane at the time of the offense.

Shortly after Tuggle was indicted, he moved the trial court for an examination pursuant to Code §§ 19.2-169.1 and -169.5, relying upon the reasons previously stated. The Commonwealth's Attorney neither concurred in nor opposed the motion. Although no evidence was presented to the court in support of the motion, the court granted it solely because "this is a capital murder case."

Pursuant to the court's order, Tuggle was admitted to Central State Hospital for evaluation on November 22, 1983. Tuggle's psychiatric evaluation was conducted by Miller M. Ryans, M.D., a forensic psychiatrist, and Arthur Centor, Ph.D., a licensed clinical psychologist. On December 1, 1983, Doctors Ryans and Centor reported to the court that Tuggle was competent to stand trial and that he was sane at the time of the offense. The doctors also stated that they had formed an opinion respecting Tuggle's probability of future dangerousness, but did not report their opinion because it had not been requested.

The report reads in pertinent part:

On the basis of psychiatric interview, psychiatric evaluation, psychological interview, psychological testing, psychological evaluation, neurological examination, encephalographic examination (EEG), reports of ward behavior, and other available information, we are of the opinion that [Tuggle] is competent to plead and stand trial in that he does not lack substantial capacity to understand the proceedings against him or to assist in his own defense.

We are also of the opinion that [Tuggle] was competent at the time of the alleged crime or crimes in that he was not suffering from a defect of reason due to disease of the mind or defect of the mind and knew the nature, character and consequences of his acts and the difference between right and wrong. Furthermore, we are of the opinion that [Tuggle] was

not suffering from a loss of volition due to disease of the mind or defect of the mind at the time of the alleged crime or crimes; he was not suffering from an irresistible impulse.

Because [Tuggle] is charged with a capital crime, we advised him of his Miranda Rights to have counsel present as well as the other Miranda Rights relative to the substance of our interviews being used at a hearing if he is convicted of capital murder. [Tuggle] waived his Miranda Rights and signed such a waiver. We have formed an opinion as to the issue of the probability of future dangerousness but we are not reporting it to the Court at this time because we were not requested to do so.

On December 27, 1983, Tuggle's counsel moved for an examination by C. Robert Showalter, M.D., a forensic psychiatrist, to determine Tuggle's sanity at the time of the offense and his competency to stand trial. Counsel based the motion on the belief that Tuggle was "entitled to be examined by a psychiatrist or group of psychiatrists chosen by counsel for the Defendant *because of the seriousness of the charges heretofore lodged against the Defendant.*" (Emphasis added.) Following argument on January 3, 1984, the trial court denied the motion. The court observed that Tuggle previously had been evaluated at his own request, that the trial date was close at hand (14 days), and that logistical problems would cause a further evaluation to be cursory at best. The trial judge stated that he had previously "granted the motion for an evaluation *because of the seriousness of the case.*" (Emphasis added.)

We affirmed this ruling, noting that Tuggle did not premise his request for a private psychiatrist upon a need to rebut evidence of future dangerousness. 228 Va. at 503, 323 S.E.2d at 544-45. Additionally, we held that whether a second evaluation was warranted was "a matter resting within the sound discretion of the trial court," and that no abuse of discretion had been shown. *Id.* at 503, 323 S.E.2d at 545.

Neither party presented psychiatric evidence at the guilt phase of Tuggle's trial. At the penalty phase, however, Dr. Centor testified that Tuggle "shows a high probability of future dangerousness." Tuggle objected to this testimony solely on the ground that he was examined without the benefit of counsel. We rejected this contention, concluding that Tuggle voluntarily, knowingly, and in-

telligently waived his right to counsel. 228 Va. at 515, 323 S.E.2d at 552.

## II

■ First, we consider the effect of *Ake* on the guilt phase of Tuggle's trial. As previously noted, the Supreme Court held that a state must assure an indigent defendant "access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense" when the defendant "demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial." 470 U.S. at 83. Thus, before an indigent defendant is entitled to such psychiatric assistance, he must make a "threshold showing to the trial court that his sanity is likely to be a significant factor in his defense." *Id.*

These are the facts in *Ake:* Ake was charged with murdering a couple and wounding their two children. During pre-arraignment confinement and at arraignment, which was just four months after the offenses, Ake's behavior was so bizarre that the trial judge *sua sponte* ordered him to undergo a psychiatric examination. A psychiatrist diagnosed Ake as a probable paranoid schizophrenic and recommended an extensive psychiatric evaluation to ascertain whether Ake was competent to stand trial. The psychiatrist reported: "At times [Ake] appears to be frankly delusional . . . . He claims to be the 'sword of vengeance' of the Lord and that he will sit at the left hand of God in heaven."

Thereupon, Ake was committed to an Oklahoma state hospital for an examination respecting his competency to stand trial. The chief forensic psychiatrist at the hospital advised the court that Ake was not competent to stand trial. The court then conducted a competency hearing, at which a psychiatrist testified:

> [Ake] is a psychotic . . . his psychiatric diagnosis was that of paranoid schizophrenia—chronic, with exacerbation, that is with current upset, and that in addition . . . he is dangerous . . . . [B]ecause of the severity of his mental illness and because of the intensities of his rage, his poor control, his delusions, he requires a maximum security facility within—I believe—the State Psychiatric Hospital system.

The court found that Ake was incompetent to stand trial and committed him to the state mental hospital.

Six weeks later, the chief forensic psychiatrist advised the court that Ake had become competent to stand trial. Ake was taking 200 milligrams of Thorazine, an antipsychotic drug, three times daily. The psychiatrist informed the court that if Ake continued taking that dosage of Thorazine, his condition would remain stable. The State then resumed prosecution of Ake.

At a pretrial conference, Ake's counsel informed the court that Ake would raise an insanity defense. Ake's attorney claimed that a psychiatrist would have to examine Ake regarding his mental condition at the time of the offense for the attorney to adequately prepare and present an insanity defense. Although Ake was confined to the state hospital for three months, no inquiry had been made into his sanity at the time of the offense, and Ake was an indigent who could not afford to pay for a psychiatrist. His attorney requested that the court either arrange for a psychiatric examination or provide funds to allow the defense to arrange an examination. The trial judge denied both requests.

At the guilt phase of his trial, Ake's sole defense was insanity. Although his counsel questioned each of the psychiatrists who had examined Ake at the state hospital, none testified about his mental state at the time of the offense because none examined him on that point. The prosecution then asked each psychiatrist if he had performed or seen the results of any examination diagnosing Ake's mental state at the time of the offense. Each doctor replied that he had not. Thus, no expert testimony concerning Ake's sanity at the time of the offense was introduced for either side.

The court informed the jurors that Ake could be found not guilty by reason of insanity if he did not have the ability to distinguish right from wrong at the time of the alleged offense. They were also instructed that Ake was to be presumed sane at the time of the crime unless he presented evidence sufficient to raise a reasonable doubt about his sanity at that time. The jurors were told that if Ake raised such a doubt in their minds, the burden of proof to prove sanity beyond a reasonable doubt shifted to the State. By its verdict of guilty on all counts, the jury rejected Ake's insanity defense.

The State requested the death penalty at the sentencing proceeding. Neither side presented new evidence. The prosecutor, in establishing the likelihood of Ake's future dangerous behavior, re-

lied significantly on the testimony of the state psychiatrists who had examined Ake, and who had testified at the guilt phase that Ake was dangerous to society. Ake did not have an expert witness to rebut this testimony. By its verdict, a jury sentenced Ake to death on each of the two murder counts. The jury also sentenced him to 500 years' imprisonment on each of the two counts of shooting with intent to kill.

The facts of *Ake* clearly establish that Ake demonstrated to the court that his sanity at the time of the offense would be a significant factor at trial. His bizarre behavior at arraignment and while in jail prior to arraignment caused the trial judge *sua sponte* to order a psychiatric examination. The court found that Ake was mentally ill and incompetent to stand trial less than six months after he committed the offenses. There was abundant evidence presented to support this finding and none to refute it.

As the Supreme Court observed, Ake made a "threshold showing to the trial court that his sanity [was] likely to be a significant factor in his defense." Indeed, insanity was his only defense. Nevertheless, Ake was never examined for an evaluation of his mental state *at the time of the offense*. Thus, Ake never was afforded the opportunity to obtain and present the only evidence germane to his defense, *i.e.,* "the ability to distinguish right from wrong at the time of the alleged offense." 470 U.S. at 72.

*Tuggle*'s facts pale when they are contrasted with *Ake*'s. Throughout the trial, the court had an opportunity to observe Tuggle's appearance and demeanor. Nothing in the record suggests any bizarre behavior by him in court or that counsel claimed such behavior ever occurred at other times and places. Had counsel been aware of any abnormal conduct, it is reasonable to believe that they would have reported it. They made no such report. On the other hand, the report of Doctors Ryans and Centor indicates that they thoroughly examined and evaluated Tuggle and states unequivocally that he was sane at the time of the offense and competent to stand trial.

It is true that Tuggle received psychiatric testing while in the Commonwealth's penal system, but such examinations are routine. Tuggle never attempted to introduce the test results; thus, the trial court reasonably could assume that they would not support his motion. Indeed, when Tuggle requested a private psychiatrist, he made no showing to the trial court that his sanity was likely to be a significant factor in his defense. Nothing was presented ex-

cept the motion containing counsel's conclusory statement that Tuggle was "entitled to be examined by a psychiatrist or group of psychiatrists chosen by counsel for the Defendant because of the seriousness of the charges." *Ake* makes clear, however, that an indigent defendant does *not* have "a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own." 470 U.S. at 83.

■ Tuggle contends, nevertheless, that merely by ordering the psychiatric examination pursuant to Code §§ 19.2-169.1 and -169.5, the trial court, as a matter of law, found probable cause. Thus, he argues, the probable cause standard is the equivalent of the threshold "significant factor" test in *Ake*.

It is true that these two statutes provide for an examination if "the court finds, upon hearing evidence or representations of counsel, that there is probable cause" to believe either that a defendant lacks competency to stand trial, Code § 19.2-169.1, or that he was affected by mental disorders at the time of the offense, Code § 19.2-169.5. The record is clear, however, that counsel did not make such a showing to the court either by evidence or representations. The court ordered the examination solely because "this is a capital murder case."

■ We conclude that Tuggle failed to make the requisite *Ake* threshold demonstration. He did not demonstrate to the trial judge that his sanity at the time of the offense would be a significant factor at trial. We hold, therefore, that when its ruling is reexamined in light of *Ake,* the trial court did not err in denying Tuggle's request for an independent psychiatrist to assist in his defense in the guilt phase of his trial.

## III

■ Next, we consider *Ake*'s effect on the penalty phase of Tuggle's trial. *Ake* holds that when the prosecution in a capital sentencing proceeding presents psychiatric evidence of an indigent defendant's future dangerousness, due process requires that a state provide the defendant the assistance of a psychiatrist on the issue. 470 U.S. at 83-84. In *Tuggle,* the Commonwealth presented psychiatric evidence that Tuggle "shows a high probability of future dangerousness."[1] Therefore, even though Tuggle's trial and

---

[1] Tuggle did not object to the admissibility of this evidence on the ground that he had been denied access to an independent psychiatrist. Instead, he objected on the ground that

direct appeal before us predated *Ake,* we conclude in light of *Ake* that the trial court erred in denying Tuggle's motion for an independent psychiatrist to rebut the Commonwealth's psychiatric evidence of future dangerousness.[2]

■ Our inquiry, however, does not end here. The General Assembly has provided that the death penalty shall not be imposed on one convicted of capital murder unless the Commonwealth proves beyond a reasonable doubt (1) "that there is a probability based upon evidence of the prior history of the defendant or of the circumstances surrounding the commission of the offense of which he is accused that he would commit criminal acts of violence that would constitute a continuing serious threat to society," *or* (2) "that his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim." Code § 19.2-264.4(C); *see also* Code § 19.2-264.2. The first of the above-stated aggravating factors is the so-called "dangerousness" predicate. The second is the so-called "vileness" predicate. Therefore, when either predicate is proved beyond a reasonable doubt, a jury may impose the death penalty.

The trial court permitted the jury to consider both aggravating factors under an instruction which parallels the statute.[3] The jury

---

the psychiatric examination was performed without the benefit of counsel. We rejected this contention because Tuggle voluntarily, knowingly, and intelligently had waived his right to counsel. 228 Va. at 515, 323 S.E.2d at 552.

[2] We note, however, that Tuggle never requested a psychiatrist to rebut future dangerousness, but only to reevaluate him as to sanity and competency to stand trial. 228 Va. at 503, 323 S.E.2d at 544-45.

[3] The instruction reads:

You have convicted the defendant of an offense which may be punished by death. You must decide whether the defendant shall be sentenced to death or to life imprisonment. Before the penalty can be fixed at death, the Commonwealth must prove beyond a reasonable doubt at least one of the following two alternatives:

    (1) That, after consideration of his past criminal record, there is a probability that he would commit criminal acts of violence that would constitute a continuing serious threat to society; or

    (2) That his conduct in committing the offense was outrageously or wantonly vile, horrible or inhuman, in that it involved torture, depravity of mind or aggravated battery to the victim beyond the minimum necessary to accomplish the act of murder.

If you find from the evidence that the Commonwealth has proven beyond a reasonable doubt either of the two alternatives, then you may fix the punishment of the defendant at death or if you believe from all the evidence that the death penalty is

found that both the "dangerousness" and "vileness" predicates had been proved beyond a reasonable doubt.[4] Thereafter, pursuant to Code § 19.2-264.5, the trial court ordered a thorough investigation into Tuggle's history to determine whether the death sentence was appropriate and just. After considering the report and additional evidence, the court confirmed the verdict and sentenced Tuggle to death.

We reviewed Tuggle's death sentence as mandated by Code § 17-110.1. In doing so, we recited certain facts which are also relevant here:

Approximately 9:30 a.m. on June 2, the investigator went to the place where Tuggle said Havens would be found. He found Havens' body at the site. Havens was clad in jeans "down around her knees," a blue and white striped blouse "pulled up to about the armpits," and "black silk panties . . . rolled down somewhat." A portion of the victim's pantyhose was "sticking out of the top" of her jeans, and one of her legs was out of the pantyhose.

An autopsy revealed that the victim's body had an abrasion and a bruise on the left frontal area of the forehead, a small abrasion on the right frontal area of the forehead, an abrasion on the neck, a bite mark on the lower, inner quadrant of the right breast, a number of small bruises on the upper, inner aspect of the right arm, and a bruise on the

---

not justified, then you shall fix the punishment of the defendant at life imprisonment.

If the Commonwealth has failed to prove either alternative beyond a reasonable doubt, then you shall fix the punishment of the defendant at life imprisonment.

The sentencing verdict reads:

We, the jury, on the issue joined, having found the defendant guilty of the willful, deliberate and premeditated killing of Jessie Geneva Havens during the commission of, or subsequent to, rape and having unanimously found after consideration of his past criminal record that there is a probability that he would commit criminal acts of violence that would constitute a continuing serious threat to society,

and

having unanimously found that his conduct in committing the offense is outrageously or wantonly vile, horrible or inhuman in that it involved torture, depravity of mind and aggravated battery to the victim beyond the minimum necessary to accomplish the act of murder, and having considered the evidence in mitigation of the offense, unanimously fix his punishment at death.

/s/ Robert C. Brown
FOREMAN

right thumb and right wrist. Havens also had sustained a large bruise on the upper, inner thigh, bruises on the vaginal vault at the posterior aspect and near the bottom, and a gunshot wound in the chest.

According to the medical examiner, "the bruises of the vagina indicate penetration of the vaginal vault by something, a penis, a finger, an object, something." The medical examiner testified that both the bite mark on the breast and the bruising around the vagina occurred while Havens was alive. He also testified that no semen or spermatozoa was found in Havens' vagina, but that semen was found in the rectum, indicating "penetration and ejaculation into the rectum."

A forensic odontologist testified that he examined the bite mark on the victim's right breast. He compared the mark with models of Tuggle's teeth and concluded "with all medical certainty these marks on the body of Ms. Havens were made by the teeth of Mr. Tuggle." He further opined that Havens was alive and moving when she was bitten.

228 Va. at 501-02, 323 S.E.2d at 544. We concluded that Tuggle's conduct in committing the offense "was outrageously vile and involved depravity of mind." 228 Va. at 517, 323 S.E.2d at 554. We also opined that "the battery to the victim was aggravated and 'more culpable than the minimum necessary to accomplish an act of murder.'" *Id.*

■ When a jury makes separate findings of specific statutory aggravating circumstances, any of which could support a sentence of death, and one of the circumstances subsequently is invalidated, the remaining valid circumstance, or circumstances, will support the sentence. *Zant* v. *Stephens,* 462 U.S. 862 (1983); *see also Poyner* v. *Commonwealth,* 229 Va. 401, 422-23, 329 S.E.2d 815, 830 (1985).

In *Zant,* Stephens was found guilty of murder and sentenced to death under Georgia law. The jury based its verdict upon three specific statutory aggravating circumstances, any of which could support the death penalty. The Supreme Court of Georgia, in a later case, invalidated one of the aggravating circumstances found to exist in *Zant,* because it was unconstitutionally vague.

In a state habeas proceeding, the Supreme Court of Georgia held that Stephens' sentence was valid because it was supported by the other aggravating circumstances. In a federal habeas pro-

ceeding, the United States Court of Appeals for the Fifth Circuit set aside Stephens' death sentence. The Supreme Court reversed. It agreed with the Supreme Court of Georgia that the sentence was valid and reinstated Stephens' sentence because it was supported by the remaining two aggravating circumstances. 462 U.S. at 879.

█ In *Tuggle,* the jury made a separate, specific finding that the "vileness" predicate had been proved beyond a reasonable doubt. Although *Ake* requires the conclusion that the trial court erred in denying Tuggle an independent psychiatrist once the Commonwealth had submitted psychiatric evidence on the issue of future dangerousness, we hold, nonetheless, that the error neither impairs nor invalidates the jury's finding of vileness.

Accordingly, we reaffirm Tuggle's conviction and sentence.[5]

*Affirmed.*

---

[5] The Attorney General suggests that the trial court's error requires that the case be remanded for resentencing. This court, however, is not bound to accept the suggestion of a party concerning a question of law. *Orloff* v. *Willoughby,* 345 U.S. 83, 87, *reh'g denied,* 345 U.S. 931 (1953).