**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

LEM DAVID TUGGLE,
Petitioner-Appellee,

v.                                                          No. 94-4005

J. D. NETHERLAND, Warden,
Respondent-Appellant.

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
James C. Turk, District Judge.
(CA-92-737-R)

Argued: March 12, 1996

Decided: April 3, 1996

Before WIDENER and HAMILTON, Circuit Judges,
and CHAPMAN, Senior Circuit Judge.

_____

Remanded with instructions by published opinion. Judge Hamilton
wrote the opinion, in which Judge Widener and Senior Judge Chap-
man joined.

_____

**COUNSEL**

**ARGUED:** Donald Richard Curry, Senior Assistant Attorney Gen-
eral, OFFICE OF THE ATTORNEY GENERAL, Richmond, Vir-
ginia, for Appellant. Timothy Michael Kaine, MEZZULLO &
MCCANDLISH, Richmond, Virginia, for Appellee. **ON BRIEF:**
James S. Gilmore, III, Attorney General of Virginia, OFFICE OF

THE ATTORNEY GENERAL, Richmond, Virginia, for Appellant. Helen L. Konrad, MEZZULLO & MCCANDLISH, Richmond, Virginia; Donald R. Lee, Jr., VIRGINIA CAPITAL REPRESENTATION RESOURCE CENTER, Richmond, Virginia, for Appellee.

_____

## OPINION

HAMILTON, Circuit Judge:

In Ake v. Oklahoma, 470 U.S. 68, 83 (1985), the Supreme Court held, inter alia, that when the prosecutor in a capital sentencing hearing presents psychiatric evidence of an indigent defendant's future dangerousness, due process requires that the state provide the defendant expert psychiatric assistance. This case, which is before us on remand from the Supreme Court of the United States, see Tuggle v. Netherland, 116 S. Ct. 283 (1995), presents the questions of whether harmless-error analysis is applicable to this type of Ake error, and, if so, whether the error was harmless in this case. We conclude this type of Ake error is amenable to harmless-error analysis and that the Ake error in this case was harmless under the harmless-error standard set forth in Brecht v. Abrahamson, 113 S. Ct. 1710 (1993). Accordingly, we remand the case to the district court with instructions to dismiss Tuggle's petition for writ of habeas corpus, see 28 U.S.C. § 2254.

I

In 1984, Lem Davis Tuggle was convicted of capital murder committed during or subsequent to the rape of Jessie Geneva Havens. As recounted by the Virginia Supreme Court on direct appeal, the facts surrounding Havens' murder are:

> In the early morning of June 2, 1983, State Trooper R.M. Freeman was dispatched to an area on Interstate Highway 81 in Pulaski County to look for a black pickup truck equipped with a camper. Shortly after his arrival, Freeman stopped a truck meeting that description and recognized Tuggle as the driver. When the trooper asked the defendant if he had been near the Riverside Exxon Station, Tuggle

2

responded: "Yes, I robbed it, the money's in my pocket, the gun's in the truck."

Thereupon, Freeman took possession of a .25 caliber automatic weapon. (Ballistics tests established that this gun fired the bullet which killed Havens.) While Freeman was taking Tuggle to the Pulaski County Sheriff's Office, Tuggle volunteered that he was connected with a missing person's report relating to Jessie Havens and said that he would have a "long talk" with Smyth County authorities later.

Later that morning, a Smyth County Sheriff's Office investigator interviewed Tuggle concerning Havens' disappearance. The officer advised Tuggle of his Miranda rights. Tuggle waived these rights and told the officer that he could find Jessie Havens over a bank at a certain spot on Hubble Hill Road near Seven Mile Ford. When the officer asked the defendant what had happened to Havens, Tuggle responded: "I don't know but she's there." The defendant then told the officer that he did not want to discuss the matter further until he had spoken to an attorney. He specifically stated: "From past experience, I would like to talk to an attorney. I'll probably tell you the full story later."

Approximately 9:30 a.m. on June 2, the investigator went to the place where Tuggle said Havens would be found. He found Havens' body at the site. Havens was clad in jeans "down around her knees," a blue and white striped blouse "pulled up to about the armpits," and "black silk panties . . . rolled down somewhat." A portion of the victim's pantyhose was "sticking out of the top" of her jeans, and one of her legs was out of the pantyhose.

An autopsy revealed that the victim's body had an abrasion and a bruise on the left frontal area of the forehead, a small abrasion on the right frontal area of the forehead, an abrasion on the neck, a bite mark on the lower, inner quadrant of the right breast, a number of small bruises on the upper, inner aspect of the right arm, and a bruise on the right thumb and right wrist. Havens also had sustained a large bruise on

3

the upper, inner thigh, bruises on the vaginal vault at the posterior aspect and near the bottom, and a gunshot wound in the chest.

According to the medical examiner, "the bruises of the vagina indicate penetration of the vaginal vault by something, a penis, a finger, an object, something." The medical examiner testified that both the bite mark on the breast and the bruising around the vagina occurred while Havens was alive. He also testified that no semen or spermatozoa was found in Havens' vagina, but that semen was found in the rectum, indicating "penetration and ejaculation into the rectum."

A forensic odontologist testified that he examined the bite mark on the victim's right breast. He compared the mark with models of Tuggle's teeth and concluded "with all medical certainty these marks on the body of Ms. Havens were made by the teeth of Mr. Tuggle." He further opined that Havens was alive and moving when she was bitten.

Tuggle v. Virginia, 323 S.E.2d 539, 543-44 (1984) (Tuggle I).

At Tuggle's sentencing hearing, the state introduced evidence on the two aggravating circumstances, "vileness" and "future dangerousness," either of which will support the imposition of death as punishment for murder under Virginia law.[1] As to the "vileness" aggravating circumstance, the state relied on the circumstances surrounding the murder, which included rape, sodomy, and a gunshot wound to the

_____

[1] Under Virginia law, when assessing whether to impose a sentence of death or life imprisonment, the jury must first determine whether the state established one or both of the statutory aggravating circumstances. See Va. Code Ann. § 19.2-264.4(C). If the jury finds the state has met its burden with respect to one or both of the aggravating circumstances, the jury then, after considering the evidence in mitigation, may exercise its discretion to impose either a sentence of death or life imprisonment. See Va. Code Ann. § 19.2-264.4(D). If the jury finds neither aggravating circumstance satisfied or cannot agree on a penalty, the court must impose a life sentence. See Va. Code Ann.§ 19.2-264.4(C)-(E).

4

chest. As to the "future dangerousness" aggravating circumstance, the state introduced: (1) evidence that Tuggle murdered Havens while on parole for murder; (2) evidence of Tuggle's criminal history, which in addition to another murder, included escape and armed robbery; and (3) the psychiatric testimony of Dr. Centor, a licensed clinical psychologist, who testified that Tuggle demonstrated"a high probability of future dangerousness." (J.A. 202). After its deliberations, the jury found both the "vileness" and "future dangerousness" aggravating circumstances were established and exercised its discretion to sentence Tuggle to death.

Tuggle's conviction and sentence were affirmed by the Virginia Supreme Court on direct appeal. See Tuggle I, 323 S.E.2d at 554. On appeal to the Supreme Court of the United States, the Court vacated the judgment of the Virginia Supreme Court and remanded the case for further consideration in light of Ake. See Tuggle v. Virginia, 471 U.S. 1096 (1985) (summary disposition). In Ake , the Court held that due process, under certain circumstances, requires the states to provide an indigent criminal defendant with expert psychiatric assistance. The Court held:

> [W]hen a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense.

470 U.S. at 83. Additionally, the Court held that when the prosecutor in a capital sentencing hearing presents psychiatric evidence of an indigent defendant's future dangerousness, due process requires that the state provide the defendant expert psychiatric assistance. Id. Because Tuggle had been denied expert psychiatric assistance after the state introduced Dr. Centor's testimony, the Supreme Court vacated the Virginia Supreme Court's judgment and remanded the case in light of Ake.

On remand, because of the Ake error, the Virginia Supreme Court merely invalidated the future dangerousness aggravating circumstance. See Tuggle v. Virginia, 334 S.E.2d 838, 844-46 (1985)

5

(Tuggle II). Notwithstanding the Ake error, the Virginia Supreme Court in Tuggle II reaffirmed Tuggle's death sentence, id. at 845-46, relying on Zant v. Stephens, 462 U.S. 862, 884 (1983), which held that if one aggravating circumstance supports a death sentence in a "non-weighing" state, like Virginia, the sentence need not be vacated merely because the jury also found an invalid aggravating circumstance. The Virginia Supreme Court reasoned that the death sentence could stand under Zant because the jury, in addition to finding the "future dangerousness" aggravating circumstance, found the "vileness" aggravating circumstance. Tuggle II, 334 S.E.2d at 845-46. In Tuggle II, the Virginia Supreme Court reviewed the evidence as to vileness and stated:

> In Tuggle, the jury made a separate, specific finding that the "vileness" predicate had been proved beyond a reasonable doubt. Although Ake requires the conclusion that the trial court erred in denying Tuggle an independent psychiatrist once the Commonwealth had submitted psychiatric evidence on the issue of future dangerousness, we hold, nonetheless, that the error neither impairs nor invalidates the jury's finding of vileness.

Id. at 846.

Tuggle filed a petition for a writ of certiorari in the Supreme Court of the United States. This petition was denied on June 30, 1986. See Tuggle v. Virginia, 478 U.S. 1010 (1986).

Tuggle then filed a petition for writ of habeas corpus in the United States District Court for the Western District of Virginia. See 28 U.S.C. § 2254. Tuggle's petition raised numerous issues, including a claim under Ake. The district court granted the petition for writ of habeas corpus on several grounds, including Ake .

The state appealed and we reversed and remanded to the district court with instructions to dismiss the petition. Tuggle v. Thompson, 57 F.3d 1356, 1374 (4th Cir. 1995). On the Ake issue, we agreed with the Virginia Supreme Court's analysis in Tuggle II. In fact, quoting the Virginia Supreme Court, we stated:

6

> "When a jury makes specific findings of specific statutory aggravating circumstances, any of which could support a sentence of death, and one of the circumstances subsequently is invalid, the remaining valid circumstance, or circumstances, will support the sentence."

Id. at 1363 (quoting Tuggle II, 334 S.E.2d at 845). Our analysis in this decision was consistent with our prior Fourth Circuit precedent. For example, in Briley v. Bass, we held that any one aggravating circumstance deemed sufficient by the jury suffices to uphold a death sentence:

> [S]ince the jury returned a verdict finding the death sentence warranted under both the "vileness" and the "dangerousness" standard, it is of no importance whether the instruction on "vileness" was correct so long as the instruction on "dangerousness" was correct, provided, of course, the verdict of the jury was unanimous on the "dangerousness" ground.

742 F.2d 155, 165 (4th Cir. 1984).

On appeal, the Supreme Court granted certiorari and vacated our judgment. See Tuggle v. Netherland, 116 S. Ct. at 284. The Supreme Court reasoned that while Zant permits the imposition of the death penalty in "non-weighing" states, if an invalid aggravating circumstance is considered, "that holding does not support the quite different proposition that the existence of a valid aggravator always excuses a constitutional error in the admission or exclusion of evidence." Id. at 285. And while the Court was willing to assume that the Ake error had no influence upon the jury's "vileness" finding, the Court was unwilling to assume that the Ake error did not affect the jury's ultimate decision whether to impose a life sentence or the death penalty. Id. The Court then remanded the case to this court for a determination of "whether harmless-error analysis is applicable to this case." Id.

II

A

Almost thirty years ago, the Supreme Court recognized that there are "some constitutional errors which in the setting of a particular

7

case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless." Chapman v. California, 386 U.S. 18, 22 (1967). Since Chapman, the Supreme Court has applied harmless-error analysis to a wide variety of errors. See, e.g., Clemons v. Mississippi, 494 U.S. 738, 752-54 (1990) (overbroad jury instruction at the sentencing hearing of defendant's capital trial); Carella v. California, 491 U.S. 263, 266 (1989) (erroneous conclusive presumption in jury instruction); Rose v. Clark, 478 U.S. 570, 579-80 (1986) (jury instruction containing erroneous rebuttable presumption); Delaware v. Van Arsdall, 475 U.S. 673, 684 (1986) (Confrontation Clause violation involving improper restriction on defendant's right to cross-examine government witness for bias). The doctrine of harmless error "`promotes public respect for the criminal process by focusing on the underlying fairness of the trial rather than on the virtually inevitable presence of immaterial error.'" Satterwhite v. Texas, 486 U.S. 249, 256 (1988) (quoting Rose, 478 U.S. at 577).

In general, "if the defendant had counsel and was tried by an impartial adjudicator, there is a strong presumption that any other errors that may have occurred are subject to harmless-error analysis." Rose, 478 U.S. at 577. Errors amenable to harmless-error review are "trial" errors. Trial error "`occur[s] during the presentation of the case to the jury,' and is amenable to harmless-error analysis because it `may . . . be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had on the trial].'" Brecht, 113 S. Ct. at 1717 (ellipsis and brackets in original) (quoting Arizona v. Fulminante, 499 U.S. 279, 307-08 (1991)).

In contrast to "trial" errors, "structural" errors are not amenable to harmless-error analysis because such errors "infect the entire trial process," Brecht, 113 S. Ct. at 1717, thereby making "[a]ssessment of the impact of [the error] impossible." Smith v. Dixon, 14 F.3d 956, 974 (4th Cir.) (en banc), cert. denied, 115 S. Ct. 129 (1994). The Fulminante Court identified the deprivation of the right to counsel, trial by a biased judge, the unlawful exclusion of members of the defendant's race from a grand jury, and the denial of the right to a public trial as examples of "structural" errors. 499 U.S. at 309-10.

Before we address whether we can view this case through a harmless-error prism, we note that the Ake error in this case actually

8

involves two errors. The first error was the improper admission of Dr. Centor's testimony; Dr. Centor's testimony was not admissible unless the state provided Tuggle with expert psychiatric assistance. The second error, which goes hand-in-hand with the first, involves the resulting deprivation to Tuggle of expert psychiatric assistance at sentencing to rebut the state's testimony of future dangerousness. We believe both of these errors are errors of the "trial" type.

With respect to the improper admission of Dr. Centor's testimony, this error is clearly subject to harmless-error analysis. Without question, the effect of Dr. Centor's testimony on the sentencing phase "`may . . . be quantitatively assessed in the context of other evidence presented in order to determine [the effect it had]" on the jury's sentence. Brecht, 113 S. Ct. at 1717 (ellipsis and brackets in original) (quoting Fulminante, 499 U.S. at 307-08). Indeed, we have applied harmless-error analysis in cases involving improperly admitted evidence. See, e.g., Correll v. Thompson , 63 F.3d 1279, 1291-92 (4th Cir. 1995) (in case on collateral review, court applied harmless-error analysis to an error involving evidence improperly admitted under Edwards v. Arizona, 451 U.S. 477 (1981)).

This conclusion with respect to the improper admission of Dr. Centor's testimony is also supported by the Supreme Court's decision in Satterwhite. The issue before the Court in Satterwhite was whether the admission of expert psychiatric testimony at the defendant's capital sentencing hearing in violation of Estelle v. Smith, 451 U.S. 454 (1981), which held that capital defendants have a Sixth Amendment right to consult with counsel before submitting to a psychiatric examination designed to determine their future dangerousness, was subject to harmless-error analysis under Chapman. The Court concluded that harmless-error analysis applied, Satterwhite, 486 U.S. at 258, and that the error was not harmless under Chapman, id. at 258-60. The Court's application of harmless-error analysis to assess the effect of the improperly admitted psychiatric testimony on the verdict obtained in Satterwhite dictates that the Court would conclude that harmless-error analysis should be applied to the improper admission of Dr. Centor's testimony.

With respect to the error concerning Tuggle's lack of expert assistance at sentencing, this error is the converse of the first; that is, the

9

error pertaining to the admission of Dr. Centor's testimony dealt with the improper admission of evidence whereas this latter error is the equivalent of the improper exclusion of evidence. And for several reasons, we believe this error is also subject to harmless-error analysis. First, in a similar context, deprivations of the right to cross-examination under the Confrontation Clause, the Supreme Court has rejected the notion that there is an analytical distinction between errors involving the improper admission of evidence and those involving the improper exclusion of evidence. See Van Arsdall, 475 U.S. at 683-84. Under either scenario, the Van Arsdall Court noted that the state was permitted to introduce evidence that was not subject "to constitutionally adequate cross-examination," id. at 684, and concluded that "in both cases the reviewing court should be able to decide whether the not-fully impeached evidence might have affected the reliability of the factfinding process at trial." Id. Similar to Van Arsdall, courts confronting Ake errors involving the denial of expert psychiatric assistance are in a position to assess the impact of the error on the jury's ultimate sentencing determination.

Second, we find persuasive a decision of the Tenth Circuit that applied harmless-error analysis in circumstances similar to this case. See Castro v. Oklahoma, 71 F.3d 1502 (10th Cir. 1995). Castro was convicted of capital murder. During his sentencing hearing, the state introduced evidence of the vileness of Castro's crime and his future dangerousness. In its deliberations after the sentencing hearing, the jury found both the "future dangerousness" and "vileness" aggravating circumstances. Id. at 1506. On direct appeal, the Oklahoma Court of Criminal Appeals struck down the "vileness" aggravating circumstance, but affirmed the sentence. Id. After removing the invalid "vileness" aggravating circumstance and reweighing the "future dangerousness" aggravating circumstance against the mitigating circumstances, the Oklahoma Court of Criminal Appeals concluded that the death sentence was appropriate in light of the "future dangerousness" aggravating circumstance and the strong evidence of guilt. Castro v. State, 745 P.2d 394, 408-09 (Okla. Crim. App. 1987). On federal habeas review, Castro contended, among other things, that his due process rights were violated when the trial court failed to grant his request for expert psychiatric assistance after the state introduced evidence of his future dangerousness at his sentencing hearing. Castro, 71 F.3d at 1513. The Tenth Circuit agreed, holding that Cas-

10

tro's due process rights were violated when the trial court refused to appoint Castro expert psychiatric assistance during Castro's sentencing phase of his trial. Id. at 1515. The Tenth Circuit then applied harmless-error analysis, relying on an earlier decision, Brewer v. Reynolds, 51 F.3d 1519 (10th Cir. 1995), which held that Ake error is "trial" error and subject to harmless-error analysis. Castro, 71 F.3d at 1515. Applying harmless-error analysis, the Castro court concluded the error was not harmless. Id. at 1516. We are persuaded by the decision of the Supreme Court in Van Arsdall and the decision of the court in Castro and will apply a harmless-error analysis to this case.

B

Having concluded that harmless-error analysis applies in this case, we must address the question of whether the Chapman standard or the Brecht standard for harmlessness should be applied in this case. On direct appeal, the harmless-error standard for constitutional error is whether the error "was harmless beyond a reasonable doubt." Chapman, 386 U.S. at 24. Under that standard, a constitutional error may not be declared harmless if there is a "reasonable possibility" that the "error contributed to the verdict." Brecht, 113 S. Ct. at 1721. In Brecht, however, the Supreme Court concluded that granting federal collateral relief upon a mere "reasonable possibility" that the error contributed to the verdict would be inconsistent with the historic purpose of habeas corpus to afford relief only to those who have been "grievously wronged" by society. Id. Thus, the harmless error standard that a federal habeas court must apply is the same standard that a federal court must apply to nonconstitutional errors on direct appeal: whether the error had a "`substantial and injurious effect or influence in determining the jury's verdict.'" Id. at 1722 (quoting Kotteakos v. United States, 328 U.S. 750, 776 (1946)).

We believe the Brecht standard, rather than the Chapman standard, applies in this case. In Brecht, the Court directed federal courts on collateral review to apply the standard set forth in Kotteakos and determine whether the "trial" error had a "`substantial and injurious effect or influence on the jury's verdict.'" Id. Indeed, the Court specifically held that the Kotteakos harmless-error standard, rather than the Chapman standard, applied in determining whether to grant collat-

11

eral relief. Id. at 1722. Accordingly, the Brecht standard rather than the Chapman standard should be applied in this case.**2**

C

We now turn to the most difficult issue presented in this appeal: Did the trial court's decision to admit Dr. Centor's testimony on the issue of future dangerousness and its refusal to grant Tuggle expert psychiatric assistance have a "`substantial and injurious effect or influence,'" Brecht, 113 S. Ct. at 1722 (quoting Kotteakos, 328 U.S. at 776), on the jury's decision to sentence Tuggle to death? In answering this question, it is important to keep in mind that Virginia is a "non-weighing" state. In "non-weighing" states, the jury uses aggravating circumstances to determine whether the defendant is eligible for the death penalty; if the jury finds at least one aggravating circumstance, it considers all the evidence adduced at the guilt and sentencing phases of the trial in determining whether the sentence of death is the appropriate penalty. Stringer v. Black , 112 S. Ct. 1130, 1136 (1992); Zant, 462 U.S. at 872. Thus, in Virginia, the jury's use of an invalid aggravating circumstance in determining whether the death penalty is an appropriate penalty does not infect the ultimate decision to impose the death penalty provided we determine that the invalid aggravating circumstance would have made no difference to the jury's determination. As the Court in Stringer  explained:

> In a nonweighing State, so long as the sentencing body finds at least one valid aggravating factor, the fact that it also finds an invalid aggravating factor does not infect the formal process of deciding whether death is an appropriate penalty. Assuming a determination by the state appellate court that the invalid factor would not have made a difference to the jury's determination, there is no constitutional violation

_____

**2** Our own circuit precedent dictates the same result. See, e.g., Correll, 63 F.3d at 1291 (applying Brecht standard for harmlessness in habeas case involving evidence improperly admitted under Edwards); Smith, 14 F.3d at 979-80 (applying Brecht standard for harmlessness in habeas case involving unconstitutionally vague heinousness instruction).

12

resulting from the introduction of the invalid factor in an earlier stage of the proceedings.

112 S. Ct. at 1137.

We believe several factors are relevant to our inquiry into harmlessness. They include: (1) the strength of the remaining aggravating circumstance; (2) the evidence admitted (both properly and improperly) at the sentencing hearing to establish the invalid aggravating circumstance; (3) the evidence improperly excluded at the sentencing hearing; (4) the nature of any mitigating evidence; (5) the closing argument of the prosecutor; and (6) any indications that the jury was hesitant or entertained doubt in reaching its sentencing determination.

As to the first factor, the jury found the "vileness" aggravating circumstance, and the murder in this case was unquestionably vile. The murder involved rape and sodomy, and Tuggle bit Havens on the breast before shooting her in the chest and disposing of her body by throwing it over an embankment.

As to the second factor, the state introduced evidence of Tuggle's criminal history. First, the state introduced evidence that Tuggle was convicted of murder in 1972 and was sentenced to twenty years' imprisonment. Second, the state introduced evidence that Tuggle had only served approximately eleven years of his twenty-year sentence before he was released on parole and raped, sodomized, and murdered Havens. Third, the state introduced evidence that Tuggle, while in custody for the 1972 murder, escaped, and was convicted and sentenced to two years for that offense. Fourth, the state introduced evidence that, at the time of his arrest for the capital murder, Tuggle had just committed an armed robbery of a service station with the same firearm he had used to murder Havens. Finally, the state introduced the testimony of Dr. Centor, who, based upon his evaluation of Tuggle, testified that Tuggle showed "a high probability of future dangerousness." (J.A. 202). Of particular note, all of the evidence, save Dr. Centor's testimony, would have been admissible even if the state had decided not to pursue the "future dangerousness" aggravating circumstance. See Va. Code Ann. § 19.2-264.4(B) (permitting introduction of defendant's "history and background").

13

As to the third factor, we will assume, <u>arguendo</u>, that Tuggle would have produced expert psychiatric testimony to rebut Dr. Centor's conclusions on Tuggle's future dangerousness and that this evidence was improperly excluded.

As to the fourth factor, Tuggle's evidence of mitigation at the sentencing hearing consisted of the testimony of three witnesses. His aunt, Katherine Norris, testified that Tuggle was"friendly" and "good-natured" despite being raised in a rough environment. <u>Id.</u> at 208. She also testified that Tuggle's parents "raised him the best they could, . . . took him to church, and raised him in church." <u>Id.</u> Another one of Tuggle's aunts, Eunice Burgess, gave similar testimony to that of Norris, testifying that Tuggle was a nice person and that he had a hard time growing up because his father was disabled. Finally, Tuggle's mother's foster parent also testified that Tuggle was "good-natured." <u>Id.</u> at 215.

With respect to the fifth factor, the prosecutor's closing argument focused on the two statutory aggravating circumstances. With respect to the "vileness" aggravating circumstance, the prosecutor focused on the circumstances surrounding Havens' murder:

> [E]ven if [Tuggle] didn't have that past history, . . . you could still find . . . in this particular case that his conduct in regard to Ms. Havens was so outrageously . . . or wantonly vile, horrible, or inhuman, which it was, nobody, till the day you die, you'll never believe that it was not inhuman . . . or that it was anything other than horrible. That it involved torture. The woman was bitten on her breast and the testimony was that she had several bites there rotating on that one tooth. Or if you find--and again, this is calling for you to use your common sense--depravity of mind or aggravated battery to the victim. I imagine he could have chopped her up in little fine pieces and it would have been a little more aggravated but what he did to her was just as aggravated. . . . [I]t was atrocious. Way beyond the minimum necessary to even accomplish the act of murder.

<u>Id.</u> at 229-30. With respect to the "future dangerousness" aggravating circumstance, the prosecutor emphasized Tuggle's criminal history:

14

[Tuggle] was tried twelve years ago on murder and they found him guilty of second degree then, and now he's back in here again on another horrible offense, the same way, under similar circumstances. The fact that he is here in less time than he was even sentenced to ought to be a message to you as to what will happen if he doesn't get the death sentence. The only thing that I want to state to you and let it be known to everybody here and so that there is no misunderstanding as to where we stand, is that I can only say God forbid if you give him any type of sentence that permits him to get out here and do this again, and anything less than death is going to do it. There is a great possibility that he'll be able to do it again. There are enough killers out in society that go undetected and uncaught, untried, unconvicted, and can keep doing it until they finally get caught. Sometimes they never catch them at all. We caught one. We've got one. We've got him in here to where we can do something with him, and that's--let's don't miss an opportunity.

Id. at 230-31. During his closing argument, the prosecutor also informed the jury that it could consider Dr. Centor's testimony on the issue of future dangerousness and reiterated Dr. Centor's conclusion that Tuggle showed a high probability of future dangerousness.

During the prosecutor's rebuttal, he returned to the issue of Tuggle's future dangerousness and stated:

> But you've got to consider that when he reached the age of eighteen [sic] he murdered someone here in Smyth County. He was caught, he was tried, he was convicted, he was sent to the penitentiary and he served years in the penitentiary. Now, is it likely that a fellow who has done that is going to commit future criminal acts of violence? Well, what's the evidence that you've heard here? He got out of the penitentiary, he's on parole, and here we have him again, that he has killed again. He's been caught, he's been tried, he's been convicted.

Id. at 233. At this point, the prosecutor referred again to Dr. Centor's testimony about Tuggle's future dangerousness, referring to it as a

15

consideration "in addition to [Tuggle's] actions, and they speak for themselves." Id. at 233-34. The prosecutor then concluded his argument by reminding the jury that Tuggle "killed Jessie Geneva Havens, he raped her, he sodomized her, he threw her body over the bank, and . . . the indications are that if he doesn't receive the death penalty, he will kill again. We ask for the death penalty. The decision is yours." Id. at 234.

With respect to the sixth factor, the jury returned its sentencing verdict after only a little more than an hour of deliberation.

Applying these factors, we believe the improper admission of Dr. Centor's testimony and the trial court's denial of expert psychiatric assistance to Tuggle did not have a "`substantial and injurious effect or influence,'" Brecht, 113 S. Ct. at 1722 (quoting Kotteakos, 328 U.S. at 776), on the jury's decision to sentence Tuggle to death. Initially, we point out that several factors arguably support a finding that the errors were not harmless under Brecht. First, Dr. Centor's testimony was not properly admitted because the state did not provide Tuggle expert psychiatric assistance. Second, the prosecutor's closing argument relied to some extent on Dr. Centor's testimony. Third, again assuming that Tuggle would have produced expert psychiatric testimony to rebut Dr. Centor's conclusions on Tuggle's future dangerousness, this evidence was improperly excluded.

However, after a thorough review of the record, we must conclude that if the "future dangerousness" aggravating circumstance was stripped from this case, including all evidence improperly admitted or excluded and any improper comments by the prosecution on that invalid aggravating circumstance, the sentence would have been the same. First, the record in this case contains an unimpeachable "vileness" aggravating circumstance; indeed, we believe Tuggle's crime epitomized "vileness." Second, the improper admission of Dr. Centor's testimony, and the trial court's decision to deny Tuggle expert psychiatric assistance to rebut Dr. Centor's testimony on future dangerousness, neither enhanced the persuasiveness of the "vileness" aggravating circumstance nor influenced the jury's determination as to vileness. Third, the only evidence of the invalid "future dangerousness" aggravating circumstance improperly admitted was Dr. Centor's testimony that Tuggle showed "a high probability of future danger-

ousness." (J.A. 202). This evidence was at most cumulative to the evidence of Tuggle's criminal history, all of which was admissible notwithstanding the invalidation of the "future dangerousness" aggravating circumstance. See Va. Code Ann. § 19.2-264.4(B) (permitting introduction of defendant's "history and background"). Fourth, the nature of Tuggle's mitigating evidence was benign at best. Fifth, the record reflects that the jury was not at all hesitant in imposing the death sentence--the jury returned its sentencing verdict after a little more than an hour of deliberation. In sum, we harbor no doubt that the improper admission of Dr. Centor's testimony and the trial court's denial to Tuggle of expert psychiatric assistance did not have a "`substantial and injurious effect or influence,'" id., on the jury's decision to sentence Tuggle to death.

III

We have conducted an exhaustive review of the record in this case and are confident that the Ake error in this case could not have had an injurious or prejudicial effect on the jury's sentencing determination. Accordingly, we remand the case to the district court with instructions to dismiss the petition for writ of habeas corpus.

REMANDED WITH INSTRUCTIONS

17