Tuesday          23rd

         October, 2001.


Kevin Michael Potts,                                    Appellant,

 against        Record No. 2854-99-1
                Circuit Court No. CR99-1700

Commonwealth of Virginia,                              Appellee.


                    Upon a Rehearing En Banc

    Before Chief Judge Fitzpatrick, Judges Benton, Elder, Bray,
          Annunziata, Bumgardner, Frank, Clements and Agee


                    Theresa B. Berry (Berry, Ermlich,
                    Lomax & Bennett, on brief), for
                    appellant.

                    H. Elizabeth Shaffer, Assistant
                    Attorney General (Randolph A. Beales,
                    Attorney General, on brief), for
                    appellee.


        By opinion dated May 22, 2001, a divided panel of this

Court affirmed the judgment of the trial court.  See Potts v.

Commonwealth, 35 Va. App. 485, 546 S.E.2d 229 (2001).  We

granted rehearing en banc and stayed the mandate of that

decision.

        Upon rehearing en banc, the stay of this Court's May

22, 2001 mandate is lifted, and the judgment of the trial court

is affirmed for the reasons set forth in the majority panel

decision.

Chief Judge Fitzpatrick, Judges Benton, Elder and Clements dissent for those reasons expressed in the dissenting opinion of the panel.  See id. at 497-505, 546 S.E.2d at 235-39.

It is ordered that the trial court allow counsel for the appellant an additional fee of $200 for services rendered the appellant on the rehearing portion of this appeal, in addition to counsel's costs and necessary direct out-of-pocket expenses.  This amount shall be added to the costs due the Commonwealth in the May 22, 2001 mandate.

This order shall be published and certified to the trial court.

A Copy,

Teste:

Cynthia L. McCoy, Clerk

By:

Deputy Clerk

-

                                    Tuesday        26th

        June, 2001.


Kevin Michael Potts,                                      Appellant,

   against        Record No. 2854-99-1
                  Circuit Court No. CR99-1700

Commonwealth of Virginia,                                 Appellee.


                Upon a Petition for Rehearing En Banc

    Before Chief Judge Fitzpatrick, Judges Benton, Willis, Elder,
        Bray, Annunziata, Bumgardner, Frank, Clements and Agee


        On June 5, 2001 came Kevin Michael Potts, the

appellant, by court-appointed counsel, and filed a petition

praying that the Court set aside the judgment rendered herein on

May 22, 2001, and grant a rehearing en banc thereof.

        On consideration whereof, the petition for rehearing

en banc is granted, the mandate entered herein on May 22, 2001

is stayed pending the decision of the Court en banc, and the

appeal is reinstated on the docket of this Court.

        The parties shall file briefs in compliance with Rule

5A:35. The appellant shall attach as an addendum to the opening

brief upon rehearing en banc a copy of the opinion previously

rendered by the Court in this matter. It is further ordered that

                              -

the appellant shall file with the clerk of this Court twelve additional copies of the appendix previously filed in this case.

A Copy,

Teste:

Cynthia L. McCoy, Clerk

By:

Deputy Clerk

-

Present:  Judges Benton, Agee and Senior Judge Hodges
Argued at Chesapeake, Virginia


KEVIN MICHAEL POTTS
                                              OPINION BY
v.    Record No. 2854-99-1              JUDGE G. STEVEN AGEE
                                             MAY 22, 2001
COMMONWEALTH OF VIRGINIA


         FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
                      Frederick B. Lowe, Judge

            Theresa B. Berry (Berry, Ermlich, Lomax &
            Meixel, on brief), for appellant.

            H. Elizabeth Shaffer, Assistant Attorney
            General (Mark L. Earley, Attorney General, on
            brief), for appellee.


     On December 30, 1998, the appellant, Kevin Michael Potts

(Potts), was arrested for the murder and conspiracy to commit the

murder of Troy Lee Wilson.  After indictment and prior to trial, a

hearing was held July 23, 1999, upon Potts' motion to suppress his

December 30 confession to Wilson's murder.  The trial court overruled

Potts' motion.  On August 19, 1999, Potts entered a conditional

guilty plea in the Circuit Court of the City of Virginia Beach to

Wilson's murder, pursuant to a plea agreement reserving his right to

challenge the admission of his confession into evidence pursuant to

Code § 19.2-254 (the conspiracy charge being nolle prosequi).  On

this appeal, Potts argues the trial court erred in not suppressing

-

his confession, claiming it was made involuntarily.  We disagree and affirm the trial court's ruling and Potts' conviction.

## I.

## BACKGROUND

On the evening of December 9, 1998, Dawain Hopkins (Hopkins) found himself unable to pay a debt owed to his cocaine supplier, Troy Wilson (Wilson).  To stall Wilson, Hopkins' friend, Kevin Potts, paged Wilson and requested $40 of cocaine.  Wilson and Potts agreed to meet later that night at a secluded location.

At approximately 11:00 p.m., Potts arrived alone, planning to kill Wilson.  Upon Wilson's arrival, Potts distracted Wilson, causing him to turn away from Potts.  As Wilson turned, Potts stabbed him in the back of the head.  Wilson cried out and slumped to the ground, the knife embedded in his skull.

Potts dragged the victim to nearby bushes, fled, but returned almost immediately to find Wilson still alive.  Potts spent the next five minutes "having a conversation with [Wilson]," asking him such questions as, "What happened to you?  There's a knife in your head." Afterwards, Potts took money and possessions belonging to Wilson and attempted to further conceal the body, but was unable to retrieve the knife embedded in Wilson's skull.

Potts returned the next day with a crowbar to recover the knife and the cocaine Wilson had intended to sell him.  Potts told Hopkins what had happened, and the two returned to the crime scene.  They dug

a hole, buried the body and then threw the knife and some of Wilson's possessions into a nearby lake.

On December 30, 1998, Detective Christopher C. Molleen of the Virginia Beach Police Department learned that Potts was likely involved in Wilson's disappearance. Hopkins had implicated Potts in a statement made to another detective. That afternoon, Detective Molleen arrested Potts in front of his mother's home and took him to the police station. Upon arrival, Potts was placed in an interview room, his handcuffs were removed, he was allowed to use the restroom and offered something to drink.

Detective Molleen then entered the interview room, sat down, opened a notebook and advised Potts of his Miranda rights by reading from a printed card. The entire interview was recorded on videotape, which is part of the record. The detective then asked Potts if he understood his rights, and Potts said that he did.

At the time of the interview, Detective Molleen knew Potts was seventeen years old and not attending school regularly. He also knew Potts had previously been arrested on several minor charges (destruction of property, petit larceny); however, Detective Molleen did not know whether those arrests involved police interrogation. Detective Molleen likely knew Potts' mother had made several demands to other police officers that her son not be questioned without the presence of an attorney.

Approximately a minute into the interview, Potts stated that he wanted to speak with an attorney.  The following exchange and events are revealed on the videotape:

> DETECTIVE:  I think some things kind of got out of hand a couple of weeks back, situation got out control, maybe Dawain was in a little bit of trouble with a particular person, maybe you tried to help him out, it got out of hand, maybe somebody got hurt as a result of it, does that sound kind of familiar?
>
> POTTS:  I don't know.  I want to talk to a lawyer.
>
> DETECTIVE:  You want to talk to a lawyer.
>
> POTTS:  And can I contact my mom?
>
> DETECTIVE:  Nope.
>
> POTTS:  She can't talk to me?
>
> DETECTIVE:  Nope.
>
> POTTS:  Nope?  What's up with the lawyer, then?
>
> DETECTIVE:  What's up with the lawyer?  You'll get one when you get one.

Detective Molleen, from the moment Potts stated he wanted to speak with a lawyer until this point in the exchange, sat straight up in his chair, turned his body and chair away from Potts toward the table, wrote Potts' statement in his notes, set his pen down and closed the notebook.  Upon Potts' next question, the officer turned his head to face Potts, but his body and chair remained facing the table, with his writing hand and arm resting next to his closed notebook and pen.  Detective Molleen spoke in a conversational tone.

-8-

                    POTTS:  What's that mean?

                    DETECTIVE:  I can't put you on the phone to
                    contact one right now, 'cause they ain't workin'
                    right now.  Okay?  You're arrested, and you'll be
                    charged and we'll just go from there.

                    POTTS:  Well fuck it, then, I don't want a damn
                    lawyer.  What do you want to know?

                    DETECTIVE:  Just the truth, Kevin, just the
                    truth.  Things get out of control?

Potts then confessed that he had killed Wilson.  About

forty-five seconds elapsed between Potts' request to "talk to a

lawyer" and his question, "What do you want to know?"

     Approximately twenty-five minutes later, Detective Molleen

briefly left the room.  Upon returning, Detective Molleen told Potts

he was going to advise him of his rights again.  Potts answered, "I

know them."  Detective Molleen said he understood that but again read

Potts his Miranda rights.  The detective then asked Potts, "Do you

want to talk about this thing again?"  Potts replied, "Sure."  As

Detective Molleen took notes, Potts again confessed.  At a later

break in the interview, while Potts was alone, he said out loud:

"I'm going jail for the rest of my life."

     At the suppression hearing, Potts testified (1) that the night

before his arrest, he and Hopkins had smoked crack throughout the

night; (2) when they ran out of crack on the morning of the arrest,

they began smoking marijuana; and (3) the last time he had slept

prior to the arrest was two days before.  However, Detective Molleen

testified that during the interview

                                  -9-

> [Potts a]ppeared to be fine.  Didn't look like he
> was intoxicated.  I didn't smell alcohol.  Didn't
> look like he was on drugs.  Coherent.  We had a
> good conversation, and he was articulate in his
> answer.

Potts admitted he never told the detective during the interview that he was either high on drugs or tired.

Potts testified that, "I had been informed of what my rights were, but it doesn't necessarily mean that you know it [sic]."  Potts further testified that he interpreted Detective Molleen's statement, "You'll get [an attorney] when you get one," to mean he did not have a right to an attorney and he "assumed right off the fact that I wasn't going to get one anytime."

Detective Molleen testified that he considered the interview over the moment Potts stated he wanted to speak with an attorney, and he prepared to leave the room.  He explained that he told Potts he could not speak with his mother at that time because

> [t]here were many things I had to do with the
> arrest procedures for him.  Ultimately a couple
> of hours down the road he was going to run into
> her over at intake.  It wasn't part of the
> procedure, and at that time it wasn't that I
> could work it in.

The detective testified that his statement, "You'll get one when you get one," was not made in an attempt to elicit an incriminating response from Potts.  Rather, the statement reflects, "[I]t's not part of the police department procedure for me to provide him with an

-10-

attorney, and it's pretty much incumbent on his part to take care of that arrangement."

## II.

## ANALYSIS

In reviewing a trial court's denial of a motion to suppress, we view the evidence in the light most favorable to the Commonwealth as the party that prevailed below, and grant to its evidence "all reasonable inferences deducible therefrom." Giles v. Commonwealth, 28 Va. App. 527, 532, 507 S.E.2d 102, 105 (1998) (citations omitted). In addition,

> [a]lthough we review the trial court's findings of historical fact only for "clear error," we review de novo the trial court's application of defined legal standards to the facts of the case. Whether the defendant invoked his right or her right to counsel, and thereafter knowingly and voluntarily waived that right, requires that we apply defined legal standards to the historical facts.

Id. at 532-33, 597 S.E.2d at 105 (citations omitted).

In order for the confession of a criminal defendant in custody to be admissible as evidence at trial, the police must advise the defendant of the right to have counsel present during interrogation. See Quinn v. Commonwealth, 25 Va. App. 702, 710-11, 492 S.E.2d 470, 474 (1997); see also Edwards v. Arizona, 451 U.S. 477, 485-86 (1981); Miranda v. Arizona, 384 U.S. 436, 469, 475 (1966). If the suspect invokes his right to counsel during interrogation, "all police-initiated interrogation regarding any

criminal investigation must cease . . . unless the Commonwealth proves by a preponderance of the evidence that the defendant voluntarily, knowingly, and intelligently waived his right to retained or appointed counsel."  Quinn, 25 Va. App. at 710-11, 492 S.E.2d at 474-75.

The United States Supreme Court in Edwards, 451 U.S. at 484-87, adopted a three-part test to evaluate the admissibility of a statement given after the right to counsel has been invoked.

> First, the trial court must determine whether the accused "unequivocally" invoked his or her right to counsel.  Second, the trial court must determine whether the accused, rather than the authorities, initiated further discussion or meetings with the police.  Third, if the accused did initiate further discussions or conversations with the police, the trial court must then ascertain whether the accused knowingly and intelligently waived the previously invoked right to counsel.

Giles, 28 Va. App. at 532, 507 S.E.2d at 105 (citations omitted).

Without question, Potts unequivocally invoked his right to counsel, so the first prong of the Edwards test is met.  We must determine (1) whether Potts initiated the further discussion with police after he invoked his right to counsel and, if so, (2) whether that discussion without legal counsel present was done voluntarily.

In regard to Edwards' second prong, it is clear from the record that Potts initiated discussions with police after invoking his right to counsel.  In Edwards, the Supreme Court of the United States held that

-12-

an accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police.

451 U.S. at 484-85.  Elaborating on this standard, the Court in

Oregon v. Bradshaw, 462 U.S. 1039 (1983), recognized that

[t]here are some inquiries, such as a request for a drink of water or a request to use a telephone, that are so routine that they cannot be fairly said to represent a desire on the part of an accused to open up a more generalized discussion relating directly or indirectly to the investigation.  Such inquiries or statements, by either an accused or a police officer, relating to routine incidents of the custodial relationship, will not generally "initiate" a conversation in the sense in which that word was used in Edwards.

Id. at 1045.  However, the Court held that a custodial suspect's question, "Well, what is going to happen to me now?," asked after the request for counsel but prior to further interrogation by the authorities, initiated further conversation, validating the suspect's subsequent waiver of his Miranda rights.  Id. at 1045-47.

Upon Potts' invocation of the right to counsel, Detective Molleen wrote the statement, "I want to talk to a lawyer," in his notes and closed the notebook.  Detective Molleen then prepared to leave the room when Potts asked the detective, "Can I contact my mom?"  This question and the detective's answer, as well as the exchange following it, were permissible as "relating to routine

-13-

incidents of the custodial relationship." Id. at 1045. These inquiries alone would not constitute an initiation of conversations with the police sufficient to waive the right to counsel.

However, after the detective answered Potts' procedural questions, Potts unequivocally continued the conversation, waiving his right to counsel when he told the detective, "[W]ell fuck it, then, I don't want a damn lawyer. What do you want to know?" In this case, Potts' waiver of his right to counsel was just as clear and unequivocal as his prior assertion of it. Potts' statement and inquiry plainly show a willingness to further discuss the detective's investigation. The second prong of the Edwards admissibility test is met.

As to the last prong of the Edwards test, Potts claims he was subjected to coercive circumstances and, therefore, his waiver and ensuing confession were involuntary. In assessing voluntariness, the court must determine

> whether "the statement is the 'product of an essentially free and unconstrained choice by its maker,' or . . . whether the maker's will 'has been overborne and his capacity for self-determination critically impaired.'" Stockton v. Commonwealth, 227 Va. 124, 140, 314 S.E.2d 371, 381 (quoting Schneckloth v. Bustamonte, 412 U.S. 218, 225 (1973)). In determining whether the waiver was knowing and intelligent, the court must examine the totality of the circumstances. Fare v. Michael C., 442 U.S. 707, 717 (1979). Where a juvenile is involved, "[t]his includes evaluation of the juvenile's age, experience, education, background, and intelligence, and whether he has the capacity to understand the

-14-

> warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." Id. at 725; see also Green v. Commonwealth, 223 Va. 706, 710, 292 S.E.2d 605, 607 (1982); Harris v. Commonwealth, 217 Va. 715, 719, 232 S.E.2d 751, 755 (1977); Grogg v. Commonwealth, 6 Va. App. 598, 612, 371 S.E.2d 549, 556 (1988).

Roberts v. Commonwealth, 18 Va. App. 554, 557-58, 445 S.E.2d 709, 711 (1994).

In reviewing the totality of the circumstances in this case, the trial court's ruling that Potts' confession was knowingly, intelligently and voluntarily made is supported by the evidence.

While Potts was seventeen years old and perhaps a high school dropout at the time of his arrest, he appears intelligent and articulate. Detective Molleen testified that Potts appeared to be fine and did not look high on drugs or sleep deprived. Detective Molleen's impression is clearly supported by the videotape of the interview, from which the trial court could reasonably find that Potts' conversation was appropriate, his answers were responsive, he did not have difficulty focusing on what was transpiring, and while he cried on occasion, he remained calm.

Although "it is desirable to have a parent, counsel or some other interested adult or guardian present when . . . a juvenile waives fundamental constitutional rights and confesses to a serious crime . . . , the mere absence of a parent or counsel does not render the waiver invalid." Grogg, 6 Va. App. at 613, 371 S.E.2d at 557.

-15-

The absence of a parent is but one factor to be considered in the totality of the circumstances and is insufficient by itself to render Potts' confession involuntary. Id.; see also Novak v. Commonwealth, 20 Va. App. 373, 387-88, 457 S.E.2d 402, 409 (1995) (absence of parent at questioning of sixteen-year-old defendant insufficient to preclude finding that confession was voluntary).

We find no support for the allegation of coercion. Potts was questioned by one plainclothes detective in a room large enough for him to get up and move around, and he wore no restraints. Cf. Grogg, 6 Va. App. at 614, 371 S.E.2d at 557 (questioning of juvenile defendant, not in handcuffs, by three plainclothes officers was not "coercive" environment). As Potts confirmed at the suppression hearing, Detective Molleen never threatened him or told him to keep talking once he had waived his rights.

At no time did Detective Molleen tell Potts that he could not speak with an attorney; instead, Detective Molleen told Potts that he could not provide him with one right then and that Potts would have one when he arranged for one. As the Supreme Court of Virginia has observed: "Miranda nowhere requires that a suspect be told he has the right to immediate appointment of counsel. Indeed, language in Miranda negates this very proposition." Poyner v. Commonwealth, 229 Va. 401, 409, 329 S.E.2d 815, 822, cert. denied, 474 U.S. 865 (1985).

Potts testified at the suppression hearing that while he was read his rights, he did not necessarily understand them. He

-16-

testified that he thought he would be able to go home if he talked to the police.  Assuming Potts mistakenly believed this, he also admitted that Detective Molleen never threatened him, never encouraged him to talk and never promised leniency or gave any other inducements.  Potts' mistake, therefore, was not the result of police coercion, the necessary predicate for a finding that a confession is involuntary.  Bottenfield v. Commonwealth, 25 Va. App. 316, 323, 487 S.E.2d 883, 887 (1997) (citing Colorado v. Connelly, 479 U.S. 157, 167 (1986)).

Upon a review of the record and applicable law, we hold the trial court could reasonably find that Potts' confession was properly admissible under Edwards.  Potts initiated the discussion with police after invoking his right to counsel.  The Potts initiated conversation led to his subsequent confession without legal counsel present and that confession was knowingly, intelligently and voluntarily made.

The denial of the motion to suppress was proper, and the conviction is, accordingly, affirmed.

Affirmed.

-17-

Benton, J., dissenting.

I would hold that the trial judge admitted the juvenile's statements in evidence in violation of the Fifth Amendment.

I.

One of the constitutional safeguards established by Miranda v. Arizona, 384 U.S. 436 (1966), is the right of an accused person to have an attorney present at a custodial interrogation and to end the interrogation by invoking this right. Id. at 469, 474-75. See also Edwards v. Arizona, 451 U.S. 477, 485-86 (1981). The Supreme Court has held that "the rigid rule [of Miranda means] that an accused's request for an attorney is per se an invocation of his Fifth Amendment rights." Fare v. Michael C., 442 U.S. 707, 719 (1979). Thus, if, in violation of these rights, "the interrogation continues without the presence of an attorney and a statement is taken, a heavy burden rests on the government to demonstrate that the defendant knowingly and intelligently waived his privilege against self-incrimination and his right to retained or appointed counsel." Miranda, 384 U.S. at 475 (citing Escobedo v. Illinois, 378 U.S. 478, 490 n.14 (1964)).

> In order to "prevent police from badgering a
> defendant into waiving his previously asserted
> Miranda rights" and to "protect the suspect's
> 'desire to deal with the police only through
> counsel,'" the United States Supreme Court
> established the "Edwards rule" as a "second layer
> of prophylaxis for the Miranda right to counsel."
> Pursuant to Edwards and its progeny, once the

> defendant invokes his <u>Miranda</u> right to counsel, <u>all</u> police-initiated interrogation regarding <u>any</u> criminal investigation must cease unless the defendant's counsel is present at the time of questioning.  If the police initiate interrogation of a defendant after he has invoked his <u>Miranda</u> right to counsel and before his counsel is present, "a valid waiver of this right cannot be established . . . even if he has been advised of his rights."

<u>Quinn v. Commonwealth</u>, 25 Va. App. 702, 710-11, 492 S.E.2d 470, 474 (1997) (citations omitted).

The Supreme Court has also explained "that an accused . . . , having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."  <u>Edwards</u>, 451 U.S. at 484-85.  The rule in "<u>Edwards</u> focuses on the state of mind of the suspect and not of the police."  <u>Arizona v. Roberson</u>, 486 U.S. 675, 687 (1988).

Before Detective Molleen began interrogating Kevin Michael Potts, who was seventeen years old and lived with his parents, he was aware that Potts' mother had refused permission for the police to interview Potts.  The detective disregarded her express request. After he read <u>Miranda</u> warnings to Potts, the following colloquy occurred:

DET. MOLLEEN:  I think some things kind of got out of hand a couple of weeks back, situation got out of control, maybe Dawain was in a little bit of trouble with a particular person, maybe you tried to help him out, it got out of hand, maybe somebody got hurt as a result of it, does that sound kind of familiar?

POTTS:  I don't know.  I want to talk to a lawyer.

DET. MOLLEEN:  You want to talk to a lawyer.

POTTS:  And can I contact my mom?

DET. MOLLEEN:  Nope.

POTTS:  She can't talk to me?

DET. MOLLEEN:  Nope.

POTTS:  Nope?  What's up with the lawyer, then?

DET. MOLLEEN:  What's up with the lawyer?  You'll get one when you get one.

POTTS:  What's that mean?

DET. MOLLEEN:  I can't put you on the phone to contact one right now, 'cause they ain't workin' right now.  Okay?  You're arrested, and you'll be charged and we'll just go from there.

POTTS:  Well fuck it, then, I don't want a damn lawyer.  What do you want to know?

DET. MOLLEEN:  Just the truth, Kevin, just the truth.  Things get out of control?

Potts unambiguously requested to speak to an attorney.

Mimicking Potts' request, the detective gave no indication that it would be honored and, thus, effectively ignored that request.  Potts next asked to contact his mother, which was a rational way for a juvenile to seek an adult's assistance in obtaining an attorney.  If we assume the detective intended to honor Potts' request for an attorney, it would appear that the detective would have either permitted Potts to contact his parents or told him when contact would be permitted.  Instead, by his blunt, terse refusal of Potts' request to speak to his mother, an adult Potts trusted, the detective

-20-

effectively and immediately denied Potts the right to an attorney. By telling Potts, "you'll get [an attorney] when you get one," the detective essentially communicated to Potts that he had to make those arrangements himself.  Indeed, the detective testified at the hearing, "it's pretty much incumbent on his part to take care of that arrangement."  At no time did the detective indicate to Potts how his right to an attorney would be honored or when.  The detective's statement, "you're arrested, and you'll be charged and we'll just go from there," effectively communicated a rejection of Potts' request for counsel.

"The concern of the Court in Miranda was that the 'interrogation environment' created by the interplay of interrogation and custody would 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination." Rhode Island v. Innis, 446 U.S. 291, 299 (1980).  As the Court noted in Miranda:  "If authorities conclude that they will not provide counsel during a reasonable period of time in which investigation . . . is carried out, they may refrain from doing so without violating the person's Fifth Amendment privilege so long as they do not question him during that time."  384 U.S. at 474. Miranda and Edwards were intended to "dispel the compulsion inherent in custodial surroundings."  Id. at 458.  We ignore reality if we assume a juvenile, such as Potts, has the means, maturity, and capability to secure on his or her own initiative, while confined in

-21-

jail, an attorney to assist him or her.  See Fare, 442 U.S. at 725 (including a juvenile's age in the determination whether a waiver occurred).

In addition, the Supreme Court has expressly ruled that "custodial interrogation for purposes of Miranda includes both express questioning and words or action that . . . the officer knows or reasonably should know are likely to 'have . . . the force of a question on the accused,' and therefore be reasonably likely to elicit an incriminating response." Pennsylvania v. Muniz, 496 U.S. 582, 601 (1990) (citation omitted).  I believe the detective's mimicking responses were designed to cause Potts to engage in additional conversation.  They had the effect of stimulating conversation and were the functional equivalent of continuing interrogation.  The rule in Edwards was not intended to give the law enforcement officers an opportunity to use interrogation tactics to snare unwary teenagers into asking questions about the means to effect their Miranda rights and then to use those inquiries as a guise to blatantly disregard constitutionally required procedures. When Potts asked to contact his mother, who was his obvious means of securing an attorney, the detective curtly denied that request. Following this denial, the detective's further mimicking statements, "What's up with the lawyer?  You'll get one when you get one," effectively refused to honor Potts' request.  Seeking some explanation about his means of contacting an attorney, which the

detective's responses certainly made illusory, Potts was again rebuffed by the detective's response that no attorneys were working. This response only served, as did the others, to eliminate Potts' options for obtaining an attorney.

The officer's technique manifestly raised the level of isolation and hostility imposed on this juvenile by denying him even the most basic assurance that his request for counsel would be honored. Indeed, the detective never told Potts that the police would honor his request for an attorney. His responses to Potts' inquiries about an attorney conveyed the unmistakable message that the detective considered Potts' request to be frivolous and that an attorney might arrive some day "when [Potts arranged to] get one." Potts' exasperated statement, "I don't want . . . a lawyer," was the culmination of impermissible conduct by the detective. Thus, I would hold that the detective's curt and mimicking responses constituted badgering that was a continuation of the interrogation in violation of Miranda. I would also hold that Potts' inquiries were "so routine that they cannot be fairly said to represent a desire . . . to . . . 'initiate' a conversation in the sense in which that word was used in Edwards." Oregon v. Bradshaw, 462 U.S. 1039, 1045 (1983).

## II.

In addition to these violations of Miranda and Edwards, the record establishes that the Commonwealth failed to prove Potts' statements were voluntarily, knowingly, and intelligently made. See

Miranda, 384 U.S. at 444.  Even before Miranda, the Fifth Amendment required that confessions be found voluntary before they could be admitted as evidence.  See Dickerson v. United States, 530 U.S. 428, 433 (2000).  In making the determination whether a statement was voluntarily, knowingly, and intelligently made, the trial judge must examine the totality of the circumstances, including the characteristics of the accused, and determine whether the accused's will was overborne by the circumstances surrounding the giving of the confession.  Schneckloth v. Bustamonte, 412 U.S. 218, 225-26 (1973).

> The ultimate test remains that which has been the only clearly established test in Anglo-American courts for two hundred years: the test of voluntariness.  Is the confession the product of an essentially free and unconstrained choice by its maker?  If it is, if he has willed to confess, it may be used against him.  If it is not, if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.

Culombe v. Connecticut, 367 U.S. 568, 602 (1961).  The Supreme Court recently reaffirmed that it has "never abandoned this . . . jurisprudence, and thus continue[s] to exclude confessions that were obtained involuntarily."  Dickerson, 530 U.S. at 434.

Even if we assume, contrary to the evidence, that Potts initiated the conversation that led to the confession, the Supreme Court has ruled as follows:

> If, as frequently would occur in the course of a meeting initiated by the accused, the conversation is not wholly

-24-

> one-sided, it is likely that the officers will say or do something that clearly would be "interrogation." In that event, the question would be whether a valid waiver of the right to counsel and the right to silence had occurred, that is, whether the purported waiver was knowing and intelligent and found to be so under the totality of the circumstances, including the necessary fact that the accused, not the police, reopened the dialogue with the authorities.

Edwards, 451 U.S. at 486 n.9. Furthermore, the principle is also well established that "even if a conversation taking place after the accused has 'expressed his desire to deal with the police only through counsel,' is initiated by the accused, where reinterrogation follows, the burden remains upon the prosecution to show that subsequent events indicated a waiver of the Fifth Amendment right to have counsel present during the interrogation." Bradshaw, 462 U.S. at 1044. See also Michigan v. Jackson, 475 U.S. 625, 633 n.6 (1986) (noting that the accused's request for counsel is "an extremely important fact" in considering whether there was a valid subsequent waiver of the right to counsel).

Noting that special problems exist with respect to waivers by juveniles, the Supreme Court has ruled that "[i]f counsel was not present for some permissible reason when an admission was obtained [from a juvenile], the greatest care must be taken to assure that the admission was voluntary, in the sense not only that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright or despair." In re Gault, 387 U.S. 1, 55 (1967). See also Haley v. Ohio, 332 U.S.

-25-

596, 599-600 (1948). Clearly, the detective who interrogated Potts did not use "the greatest care" to ensure that Potts' "admission was voluntary." Id. First, he ignored Potts' request for counsel. He then flatly refused to allow Potts to consult with his parent, a trusted adult who had the wherewithal to secure counsel for Potts, and, indeed, who had requested the police not to question Potts in her absence. As if to ensure that Potts would feel the coercive nature of his detention, the officer next misrepresented to Potts that no lawyer could be secured at that hour. Lastly, he told Potts that the process would continue without informing Potts whether or when he would have an attorney. In short, this officer conveyed to Potts the unmistakable message that he was on his own in trying to secure an attorney and in dealing with the police.

Recognizing again the special problems of juveniles, the Supreme Court observed the following in a case where the juvenile failed to ask for a lawyer or parent:

> [The period] -- during which time the boy's mother unsuccessfully tried to see him and he was cut off from contact with any lawyer or adult advisor -- gives the case an ominous cast. The prosecution says that the boy was advised of his right to counsel, but that he did not ask either for a lawyer or for his parents. But a 14-year-old boy, no matter how sophisticated, is unlikely to have any conception of what will confront him when he is made accessible only to the police. That is to say, we deal with a person who is not equal to the police in knowledge and understanding of the consequences of the questions and answers being recorded and who is unable to know how to protect his own interests

> or how to get the benefits of his constitutional rights.
>
> . . . He cannot be compared with an adult in full possession of his senses and knowledgeable of the consequences of his admissions. He would have no way of knowing what the consequences of his confession were without advice as to his rights - from someone concerned with securing him those rights - and without the aid of more mature judgment as to the steps he should take in the predicament in which he found himself. A lawyer or an adult relative or friend could have given the petitioner the protection which his own immaturity could not. Adult advice would have put him on a less unequal footing with his interrogators. Without some adult protection against this inequality, a 14-year-old boy would not be able to know, let alone assert, such constitutional rights as he had. To allow this conviction to stand would, in effect, be to treat him as if he had no constitutional rights.

Gallegos v. Colorado, 370 U.S. 49, 54-55 (1962).

III.

In summary, the record in this case establishes that the detective denied Potts' express request for counsel; he denied Potts' explicit request to speak to his mother, which was an implicit request for aid in the securing of his rights; and he refused those requests in such a fashion that Potts was given the unmistakable message that he had to fend for himself in dealing with the police. I would hold that the record established a violation of Miranda, a violation of Edwards, and a confession that was not voluntary, knowing, or intelligent. Accordingly, I would hold that the trial judge erred in refusing to suppress the confession, and I would reverse the conviction and remand for a new trial.