COURT OF APPEALS OF VIRGINIA

Present:    Judges Beales, Causey and Senior Judge Petty
Argued by videoconference


JACQUAN LEEONTE' WILSON

                                                    MEMORANDUM OPINION* BY
v.        Record No. 1542-23-1                 JUDGE DORIS HENDERSON CAUSEY
                                                         JANUARY 14, 2025
COMMONWEALTH OF VIRGINIA


             FROM THE CIRCUIT COURT OF THE CITY OF VIRGINIA BEACH
                              Stephen C. Mahan, Judge

             Kristin Paulding (7 Cities Law, on brief), for appellant.

             Liam A. Curry, Assistant Attorney General (Jason S. Miyares,
             Attorney General, on brief), for appellee.


        Following a jury trial, the trial court convicted Jacquan Leeonte' Wilson of first-degree

felony murder, robbery, and use of a firearm in the commission of a felony.  On appeal, Wilson

alleges that the trial court committed three reversible errors when it: (1) denied his motion for an

evaluation of his sanity at the time of the offense, (2) denied his motion to suppress, and (3) found

him guilty of robbery, first degree felony murder, and use of a firearm in the commission of a felony

when the evidence was insufficient to support a conviction.  Finding no reversible error, we affirm.

                                        BACKGROUND

        On May 1, 2016, Ryan Umstot drove Bryant Cueto, the victim, to the parking lot of an

Applebee's in Virginia Beach.  After they arrived, Cueto exited the vehicle and approached a silver

Nissan Altima that had just parked in the same parking lot.  After a few minutes, Cueto returned to

Umstot's vehicle and got back into the front passenger seat.  Cueto revealed that he was holding a

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

"big, clear bag of Xanax." Cueto began taking pictures of the Xanax and attempted to sell the Xanax via text messages and phone calls.

Shortly thereafter, two people approached Umstot's parked vehicle. One of those individuals, Jacquan Wilson, entered Umstot's vehicle and sat behind Umstot on the driver's side. Andarion McInnis, also known as "Kilo," walked up to the driver's window wearing a red shirt. Umstot looked at Kilo and asked him what was going on, and he responded only with a headnod gesture. At that point, Umstot "switched [his] attention from him to Mr. Wilson," and when he did that, he "saw that there was a .38 revolver sitting between [his] seats." Umstot explained that "Wilson was pointing the .38 revolver at Bryant [Cueto]" and said, "[g]ive me that shit." Umstot then screamed out, "just give him the pills." After a matter of seconds, Kilo said "Pop him," and Wilson shot Cueto in the back by his left shoulder blade. Wilson then "reached across [Umstot's] seats and snatched the bag of Xanax out of Bryant's hands," which caused some of the pills to spill out "everywhere in the car." After Wilson took the bag of Xanax, he proceeded to run back towards the Applebee's. Umstot called 911 and drove toward the hospital. He pulled over to meet the police. Officer Pringle noted that Umstot was frantic. He pulled Cueto from the car and found an entrance gunshot wound in his back but no exit wound. The bullet struck two large blood vessels that caused him to suffer massive blood loss. Cueto later died.

The police took Umstot in for questioning and seized his car. During their investigation, the police found several fingerprints on the driver's window and back door. Wilson's fingerprint was found on the back door and Kilo's fingerprint was found below the driver's window, corroborating Umstot's testimony about Wilson's presence at the robbery and murder. Wilson also made inculpatory posts on social media that corroborated both his location around the time of the offense and his desire to sell Xanax pills shortly after the robbery took place.

On May 5, 2016, Wilson was detained and detectives took him in for questioning. Wilson was interviewed by Detective Michael Marsolais and Detective John Allen in an interview room inside the Virginia Beach Police Department Detective Bureau. At the start of the interview, Marsolais unlocked Wilson's handcuffs. Before the questioning began, Wilson accepted an offer to use the bathroom. Shortly thereafter, Marsolais read Wilson his *Miranda*[1] rights and asked if he understood those rights, and Wilson responded that he did. After the interview began, Wilson stated that he wanted to speak to an attorney. In response, the detectives told Wilson that because he invoked his right to counsel, they could not "ask him anymore questions about" the investigation. The detectives explained that they would be placing Wilson under arrest for murder, robbery, and use of a firearm and that he would be taken to jail. They also explained that Wilson would not have an opportunity to make a phone call until he arrived at the jail. The detectives left the room and did not speak to Wilson for approximately eight to nine minutes.

When Allen returned, he told Wilson he would be at the station for a few hours and asked Wilson if he wanted food but did not discuss the investigation with him. Wilson did not indicate whether he wanted food, so Allen began to leave the room. As he was leaving, Wilson asked, "Why am I here?" Allen again explained to Wilson that he was going to be charged with murder. Wilson then asked, "Can I talk to you?" After both detectives returned to the interview room, they reminded Wilson that he had previously invoked his right to counsel. The detectives then expressly informed Wilson that he had the right to an attorney and that he did not have to answer any of their questions. After hearing multiple recitations of his rights from the detectives, Wilson stated unambiguously, "I want to talk about why I'm here."

Wilson then confessed to shooting Cueto. At first, he claimed that he was at the scene because he was trying to buy some Xanax. He told the detectives that when he tried to buy Xanax,

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

Cueto pulled a gun on him. Wilson told the officers that, in response, he took the gun from Cueto and shot him. Wilson admitted that he also took the Xanax. Later in the interview, Wilson admitted that he and Kilo planned the robbery and that Wilson had brought the gun to the encounter to use in the robbery. However, Wilson claimed, near the end of the interview, that he never shot anyone.

Wilson was arrested for first-degree felony murder, robbery, and use of a firearm in the commission of a felony. Wilson filed a motion to suppress his confession, which was denied, and in February 2019, his jury trial ended in a mistrial. Wilson was not able to retain counsel for the retrial, and the public defender was reappointed to his case. Wilson then asked for a new lawyer, and Harry D. Harmon was appointed.

In February 2022, Harmon asked for a competency and sanity evaluation of Wilson pursuant to Code §§ 19.2-169.1 and 19.2-169.5. Harmon told the trial court that Wilson was having trouble recalling certain information and that his behavior had abruptly changed.[2] Wilson's medical records also showed his medication being discontinued the month prior. No evidence regarding Wilson's sanity was presented at this hearing. The trial court granted the motion as to the competency evaluation but did not order a sanity evaluation. In June 2022, the court held a competency review and Wilson was determined to be competent to stand trial. The court never ruled on nor entered an order regarding the sanity evaluation.

On January 24, 2023, the trial court conducted a hearing on a motion filed by Wilson, who was then representing himself *pro se*, for an evaluation of his sanity at the time of the offense pursuant to Code § 19.2-169.5.[3] Wilson's written motion did not contain any facts or law in support of that request. At the hearing, he reminded the trial court that his former counsel, Harmon, had

_____

[2] During the hearing Wilson became unruly and was removed from the courtroom.

[3] In July 2022, Wilson filed a motion to proceed *pro se*, to which neither Harmon nor the Commonwealth's Attorney objected. In August 2022, the court granted Wilson's motion and appointed Scott F. Hallauer to serve as standby counsel for Wilson.

filed a motion in February 2022 for an evaluation of Wilson's sanity at the time of the offense.  He stated that his former counsel did not fully pursue that motion because Wilson "had an episode in court which eventually led to [him] being sent to Central State Hospital for a competency evaluation."  The Commonwealth opposed Wilson's motion, noting that Wilson had already had a nearly complete criminal trial in which the issue of his sanity at the time of the offense was never argued.  The Commonwealth also argued that, during the retrial, Wilson's sanity at the time of the offense was never raised again after he was deemed competent to stand trial and that the evaluation request was not supported by any "mental health diagnosis."

At the hearing, the trial court explained the applicable legal standard to Wilson and asked him "[w]hat was going on with you in or around [the time of the offense] that brings you to ask the court for an evaluation now?"  In response, Wilson proffered that he was seventeen years old, was using "methamphetamines and Xanax and other drugs," and "wasn't in [his] right state of mind" at the time of the offense.  The trial court, after emphasizing that "denying a defendant's request for sanity at the time of the offense is something that this court does not take lightly," ultimately denied the motion, finding that Wilson failed to establish probable cause to believe that he was insane at the time of the offense.

On March 27, 2023, the Circuit Court for the City of Virginia Beach held a multi-day jury trial for Wilson.  At the conclusion of the trial, the jury found Wilson guilty of one count of robbery, one count of first-degree murder during a robbery, and one count of use of a firearm in the commission of a felony.  By order entered August 7, 2023, the trial court sentenced Wilson to serve seventy-three years in prison, suspended seventeen of those years, and imposed an active sentence of fifty-six years in its final judgment.  This appeal timely follows.

ANALYSIS

I. The trial court did not err when it denied Wilson's motion for a sanity evaluation.

"[A]n indigent defendant who seeks the appointment of an expert, at the Commonwealth's expense, must show a particularized need for such services and that he will be prejudiced by the lack of expert assistance." *Lenz v. Commonwealth*, 261 Va. 451, 462 (2001). "Determining whether the defendant has made an adequate showing is a decision that lies within the trial court's discretion." *McCulloch v. Commonwealth*, 29 Va. App. 769, 774 (1999).

"Indigent defendants are entitled to the appointment of a psychiatrist to assist in their defense, but this right is not absolute." *Id.* at 773; *see also Ake v. Oklahoma*, 470 U.S. 68, 77 (1985). The defendant must demonstrate "that his sanity at the time of the offense is to be a significant factor at trial . . . ." *McCulloch*, 29 Va. App. at 774 (alteration in original) (quoting *Ake*, 470 U.S. at 83). A request unaccompanied by a showing of reasonableness is properly denied. *Id.*; *see also Caldwell v. Mississippi*, 472 U.S. 320, 323 n.1 (1985).

In support of his contention that the trial court erred in denying his motion for a sanity evaluation, Wilson relies on *Tuggle v. Commonwealth*, 230 Va. 99 (1984), arguing that "the [Supreme] Court [of Virginia] granted Tuggle's request for a competency and sanity evaluation simply because it was a capital murder case." Wilson argues that this suggests that "the seriousness of the offense charged can be a consideration in the Court's probable cause decision." This argument is unpersuasive because *Tuggle* not only explicitly distinguishes the seriousness of the offense charged from a trial court's probable cause determination but also presents an entirely different question of law.

*Tuggle* twice appeared before our Supreme Court. While the Court initially affirmed Tuggle's conviction and sentence, the defendant petitioned the Court for a writ of certiorari following the United States Supreme Court's ruling in *Ake v. Oklahoma*. Thus, the question in

*Tuggle* was whether the United States Supreme Court's ruling in *Ake* should impact our Supreme Court's affirmation of Tuggle's conviction. "In *Ake* . . . the Supreme Court recognized for the first time that, in certain circumstances, a state is constitutionally required to provide an indigent defendant with the assistance of a psychiatrist." *Tuggle*, 230 Va. at 101. This holding did not impact our Supreme Court's initial affirmation of Tuggle's conviction and sentence, because Tuggle was, in fact, evaluated by a psychologist and found to be both competent to stand trial and sane at the time of the offense. *Id.* at 103. Tuggle subsequently "moved for an examination by C. Robert Showalter, M.D., a forensic psychiatrist, to determine Tuggle's sanity at the time of the offense and his competency to stand trial." *Id.* The trial judge, who had "previously 'granted the motion for an evaluation because of the seriousness of the case,'" denied the motion for a second evaluation because "Tuggle previously had been evaluated at his own request, that the trial date was close at hand (14 days), and that logistical problems would cause a further evaluation to be cursory at best." *Id.* Our Supreme Court affirmed that ruling, "noting that Tuggle did not premise his request for a private psychiatrist upon a need to rebut evidence of future dangerousness." *Id.*

When the Court reconsidered its previous ruling in light of *Ake*, it found that "Tuggle failed to make the requisite *Ake* threshold demonstration [because] [h]e did not demonstrate to the trial judge that his sanity at the time of the offense would be a significant factor at trial." *Id.* at 107. Although Tuggle argued that "merely by ordering the psychiatric examination pursuant to Code §§ 19.2-169.1 and -169.5, the trial court, as a matter of law, found probable cause," and "[t]hus . . . the probable cause standard is the equivalent of the threshold 'significant factor' test in *Ake*," the trial court found that "[t]he record is clear . . . that counsel did not make such a showing to the court either by evidence or representations [because] [t]he court ordered the examination solely because '[the case] [was] a capital murder case.'" *Id.* Therefore, Wilson's use of *Tuggle* is incorrect and unpersuasive.

- 7 -

Wilson's argument, then, fails on two grounds. First, although our Supreme Court affirmed the trial court's decision, that affirmation was entirely unrelated to the trial court's initial decision to grant Tuggle's first sanity evaluations. The Court merely affirmed the trial court's denial of Tuggle's motion for a second evaluation, having found that denial was proper where "[Tuggle] did not demonstrate to the trial judge that his sanity at the time of the offense would be a significant factor at trial." *Id.* There would be no occasion for the Court in *Tuggle* to determine whether the court erred in granting the first motion for evaluation "solely because '[it was] a capital murder case.'" *Id.* Therefore, Wilson's argument amounts to reliance upon the discretion of the trial court and not on the ruling of the Supreme Court. *Id.* Second, although

> [i]t is true that these two statutes provide for an examination if "the court finds, upon hearing evidence or representations of counsel, that there is probable cause" to believe either that a defendant lacks competency to stand trial, Code § 19.2-169.1, or that he was affected by mental disorders at the time of the offense, Code § 19.2-169.5,

the Court in *Tuggle* expressly stated that "counsel did not make such a showing [of probable cause] to the court either by evidence or representations [because] [t]he court ordered the examination *solely* because '[it was]a capital murder case.'" *Id.* (emphasis added). *Tuggle* expresses, then, that while the trial court may, in its discretion, grant motions for sanity evaluations, the exercise of such discretion is not equivalent to a finding of probable cause under Code § 19.2-169.1 and § 19.2-169.5. It does not stand for the premise that a trial court must consider the seriousness of an offense as part of its probable cause determination.

After reviewing the record, Wilson failed to demonstrate that his sanity at the time of the offense would be "a significant factor at trial" as required by *Ake* and *Tuggle*. In support of his request, Wilson proffered only that at the time of the offense he was seventeen years old, was using "methamphetamines and Xanax and other drugs," and "wasn't in [his] right state of mind." Thus,

we find that the trial court properly found that Wilson's proffer was insufficient to create probable cause to believe that his sanity was in question at the time of the offense.

II. The trial court did not err in denying Wilson's motion to suppress.

"The United States Supreme Court in *Edwards* [*v. Arizona*, 451 U.S. 477 (1981),] adopted a three-part test to evaluate the admissibility of a statement given after the right to counsel had been invoked." *Potts v. Commonwealth*, 35 Va. App. 485, 493 (2001).

> First, the trial court must determine whether the accused unequivocally invoked his or her right to counsel. Second, the trial court must determine whether the accused, rather than the authorities, initiated further discussion or meetings with the police. Third, if the accused did initiate further discussions or conversations with the police, the trial court must then ascertain whether the accused knowingly and intelligently waived the previously invoked right to counsel.

*Id.* (quoting *Giles v. Commonwealth*, 28 Va. App. 527, 532 (1998)). It is undisputed that Wilson unequivocally invoked his right to counsel, "so the first prong of the *Edwards* test is met," and all that remains is to determine "(1) whether [he] initiated the further discussion with police after he invoked his right to counsel and, if so, (2) whether that discussion without legal counsel present was done voluntarily." *Id.* at 493-94.

A. *The police ended their interrogation once Wilson had invoked his right to counsel.*

This Court reviews de novo whether the police "scrupulously honored" the suspect's invocation of the right to remain silent. *Medley v. Commonwealth*, 44 Va. App. 19, 37 (2004). "When the accuracy of the recorded dialogue or transcript is undisputed, this Court reviews de novo whether a suspect's statements reinitiated questioning." *Paxton v. Commonwealth*, 80 Va. App. 449, 462 (2024) (citing *Overbey v. Commonwealth*, 65 Va. App. 636, 647 (2015)). The trial court's subsidiary factual findings are "entitled on appeal to a presumption of correctness." *Medley*, 44 Va. App. at 37 (quoting *Harrison v. Commonwealth*, 244 Va. 576, 581 (1992)). "[P]olice do not impermissibly 'initiate' renewed interrogation by engaging in routine

- 9 -

conversations with suspects about unrelated matters. And police legitimately may inquire whether a suspect has changed his mind about speaking to them without an attorney." *Foster v. Commonwealth*, 8 Va. App. 167, 174 (1989) (alteration in original) (quoting *Edwards*, 451 U.S. at 490 (Powell, J., concurring)).

In this case, the record demonstrates that the two interrogating detectives informed Wilson that he did not have to speak with them, confirmed that he understood that right, and that Wilson agreed to speak with them only after his *Miranda* rights had been fully communicated. When Wilson requested an attorney, the detectives stopped asking questions related to the incident, informed Wilson as to the next steps in the detention process, and left the interrogation room. Approximately eight to nine minutes later, Detective Allen only re-entered the room to ask Wilson if he would like anything to eat because the process may take a while. After Allen asked Wilson if he wanted any food, he "made it clear" that Wilson was not being questioned. Even so, the record indicates that Wilson affirmatively indicated that he wanted to continue speaking to both detectives about the charges against him. "While not all statements initiate a conversation under *Edwards*, such as those that 'relat[e] to routine incidents of the custodial relationship,' an accused's statements that 'evince[] a willingness and a desire for a generalized discussion about the investigation' do." *Overbey*, 65 Va. App. at 648 (alterations in original) (quoting *Oregon v. Bradshaw*, 462 U.S. 1039, 1045-46 (1983)). That Wilson once again asked Allen "why [Wilson] was there" and that "he wanted to talk about his charges" demonstrates the requisite willingness and desire to engage in a generalized discussion about the investigation. Therefore, the trial court did not err in finding that the officers did not continue to interrogate Wilson after he had invoked his right to counsel, as they only resumed their interrogation after Wilson affirmatively indicated that he wished to initiate a conversation about his arrest and charges.

B. *Wilson's statement to the police was voluntary.*

"[A]n accused, . . . having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police." *Edwards*, 451 U.S. at 484-85.  The initiation of further communication constitutes a valid waiver of an accused's right to counsel and right to remain silent only when such waiver is "not only . . . voluntary, but . . . also constitute[s] a knowing and intelligent relinquishment or abandonment of a known right or privilege, a matter which depends in each case [upon the totality of the circumstances]." *Id.* at 482.  When considering the totality of the circumstances in assessing whether an accused's statement was voluntary, "the greatest care must be taken to assure that the admission was voluntary, in the sense that it was not coerced or suggested, but also that it was not the product of ignorance of rights or of adolescent fantasy, fright, or despair." *In re Gault*, 387 U.S. 1, 55 (1967).  "[V]oluntariness is a question of law, subject to independent appellate review." *Secret v. Commonwealth*, 296 Va. 204, 225 (2018) (alteration in original) (quoting *Avent v. Commonwealth*, 279 Va. 175, 195 (2010)).

Both detectives ensured that Wilson was able to effectively communicate and understand their questions.  The detectives read Wilson his *Miranda* rights and confirmed that he understood those rights.  Not only is the record devoid of any evidence that the police engaged in either explicitly or implicitly coercive tactics, but it also demonstrably indicates that the detectives made repeated and intentional efforts to ensure that Wilson unequivocally knew and understood his right to remain silent.[4]  He chose to initiate a conversation with the detectives and continued

_____

[4] When Wilson indicated that he wanted to talk about the charges against him, Detective Allen said:

> I'm gonna explain something to you, alright?  'Cause I can't play tricks on you, I can lay stuff out for you.  I'll talk to you as long as

that conversation even after Allen stated, "you asked for a lawyer, now you're asking to talk to us again, is that right?" Wilson did not make any incriminating statements against himself until after affirmatively indicating his desire to talk to the detectives again.

After reviewing the record, we must affirm the decision of the trial court to deny Wilson's motion to suppress, as he, not the detectives, initiated conversation after invoking his right to counsel and knowingly and intelligently waived his previously invoked right to counsel.

### III. The evidence was sufficient to find Wilson guilty of robbery, first degree felony murder, and use of a firearm.

"On review of the sufficiency of the evidence, 'the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it.'" *Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "The question on appeal, is whether 'any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Id.* (quoting *Yoder v. Commonwealth*, 298 Va. 180, 182 (2019)). "The sufficiency 'inquiry does not distinguish between direct and circumstantial evidence, as the fact finder . . . "is entitled to consider all of the evidence, without distinction, in reaching its determination."'" *Rams v. Commonwealth*, 70 Va. App. 12, 27 (2019) (alteration in original) (quoting *Commonwealth v. Moseley*, 293 Va. 455, 463 (2017)).

---

> you want. If I ask you a question, you don't want to answer it, you don't have to, alright. But, I want you to understand something. You asked for a lawyer, now you're asking to talk to us again, is that right?

Detective Allen goes on to further explain

> You have a right to have a lawyer and you don't have to answer our questions. That's what you, I've explained that to you. So has [Detective Marsolais]. I come in to ask you if you wanted some food, and you asked to talk to me. Now, if you want to talk to me, I'll sit here and have a conversation with you. But, that it's up to you. I, I have to be very clear with you on that. If you don't want to talk to me about this situation, fine.

Here, the evidence is more than sufficient, even absent Wilson's confession, to support his conviction. Wilson's fingerprints were found on the car. Less than three hours after the robbery, Wilson posted on Facebook that he had "Zannys on deck." Finally, the fingerprints and social media post corroborate Umstot's testimony regarding the events. Thus, even without his confession, a rational trier of fact could find Wilson guilty of all charges beyond a reasonable doubt. This finding is not plainly wrong or without evidence to support it and should not be disturbed on appeal.

## CONCLUSION

For the foregoing reasons, the trial court's judgment is affirmed.

*Affirmed.*